209 P.3d 467 (2009)
STATE of Washington, Respondent,
v.
Alexander Nam RIOFTA, Petitioner.
In the Matter of the Personal Restraint Petition of Alexander Nam Riofta, Petitioner.
No. 79407-3.
Supreme Court of Washington, En Banc.
Argued October 23, 2007.
Decided June 11, 2009.
*469 Jacqueline McMurtrie, UW Law Clinic-Innocence Project NW, Seattle, WA, for Petitioners.
Lisa Wagner, Michelle Luna-Green, John Cummings, Pierce Co. Prosecutor's Office, Tacoma, WA, for Respondents.
Suzanne Lee Elliott, Attorney at Law, Seattle, WA, Amicus Curiae on behalf of Washington Association of Criminal Defense Lawyers.
MADSEN, J.
¶ 1 Alexander Riofta seeks DNA (deoxyribonucleic acid) testing of a white hat that was worn by the perpetrator of a shooting for which he was convicted. Under RCW 10.73.170(2)(a)(iii), a convicted person may seek DNA testing on the ground it would provide "significant new information" that would demonstrate innocence on a more probable than not basis. The trial court denied Riofta's motion on the merits. The Court of Appeals affirmed on an alternative ground that the white hat was available for testing at trial and therefore testing is not permitted under the statute because "significant new information" encompasses only evidence available due to improvements in technology.
¶ 2 We hold that the statutory language, "significant new information," includes DNA test results that did not exist at the time of trial and that are material to the perpetrator's identity, regardless of whether DNA testing could have been performed at trial. However, we affirm the trial court's ruling that Riofta failed to establish the likelihood that the DNA evidence he seeks would demonstrate his innocence.

FACTS
¶ 3 On January 27, 2000, Ratthana Sok left his home just before 7:00 a.m. to walk to school. State's Resp. to Personal Restraint Pet. (State's Resp. to PRP) at 177. It was still dark outside, but lights illuminated the area outside the house, including the driveway. As he walked onto the driveway, Sok noticed a white Honda Civic parked on the street, with two or three people inside. State's Resp. to PRP at 181. A man got out *470 of the passenger side and approached Sok. The man was wearing a white hat. When he approached within three feet, Sok recognized him as "Alex," a neighborhood resident. Id. at 187.
¶ 4 The man asked Sok for a cigarette. Sok said he didn't smoke. The man then pulled a revolver from his coat pocket, aimed it at Sok's forehead, and fired three or four shots. Sok turned and ran inside his house. The bullets missed Sok and lodged in the family car and garage door. Sok's mother called 911. The shooter fled, dropping the white hat behind on the sidewalk.
¶ 5 When the police arrived, Sok told them "Alex" had shot at him. He described "Alex" as a Cambodian male, 17 or 18 years old, 5 foot 2 inches, 125 pounds, with a moustache and shaved head. An officer took Sok to the police station and showed him a series of photos of Asian males named "Alex" or "Alexander" from a photograph database. Sok identified Alexander Riofta as the person who shot at him.
¶ 6 Sok and Riofta had known one another for four or five years. They used to play basketball together at a local park, and Riofta occasionally came to the house to visit Sok's older brother, Veasna. Sok had seen Riofta outside the house a few days earlier.
¶ 7 The police arrested Riofta for the shooting. Riofta admitted he knew Sok and his older brother, Veasna. He knew Veasna agreed to testify against two defendants involved in a notorious gang-related shooting in Tacoma, known locally as the "Trang Dai massacre," that left five people dead and five others wounded. He knew two of the Trang Dai defendants recently assaulted Sok's older brother during courtroom proceedings in the case. Riofta told the police Veasna "was a sucker for snitching on the [h]omeys, and that he deserved to get choked up in court for snitching on [the defendants]." Id. at 255. The police recovered a number of photographs and news articles about the Trang Dai defendants from Riofta's house.
¶ 8 The Honda Civic that was used in the shooting was found several blocks from Sok's residence. The car had been stolen the night before the shooting. According to its owner, the white hat found at the scene belonged to him. No DNA testing was performed on the white hat.
¶ 9 At trial, Sok identified Riofta as the shooter. The prosecutor presented evidence of Riofta's link to the Trang Dai defendants to establish motive for the shooting. The State's theory was that Riofta shot at Sok to frighten his brother and deter him from cooperating with the prosecution of the Trang Dai defendants.
¶ 10 A jury convicted Riofta of first degree assault with a firearm. Following conviction, Riofta unsuccessfully sought DNA testing of the white hat under former RCW 10.73.170 (2003).
¶ 11 As amended in 2005, RCW 10.73.170 authorizes postconviction DNA testing if the results could "provide significant new information" that would likely exonerate the petitioner. Laws of 2005, ch. 5, § 1(2)(iii). Riofta sought DNA testing under the amended statute. The trial judge who presided over the trial denied the motion. The Court of Appeals affirmed, holding that Riofta failed to establish the DNA testing could yield "significant new information" because the white hat was available for testing at trial. Riofta v. State, 134 Wash.App. 669, 691, 142 P.3d 193 (2006).

ANALYSIS
¶ 12 RCW 10.73.170(1) allows a convicted person currently serving a prison sentence to file a motion requesting DNA testing with the court that entered the judgment on conviction. The person requesting testing must satisfy both procedural and substantive requirements. RCW 10.73.170(2), (3).
¶ 13 The motion must state the basis for the request, explain the relevance of the DNA evidence sought, and comply with applicable court rules. RCW 10.73.170(2)(a)-(c). If the petitioner satisfies these procedural requirements, the court must grant the motion if it concludes the petitioner has shown the "likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).
¶ 14 As it existed from 2000 through 2004, RCW 10.73.170 allowed postconviction DNA *471 testing only when the defendant was deprived of the opportunity to use DNA test results as exculpatory evidence, either because of an adverse court ruling or because the DNA technology was insufficiently developed to test the DNA evidence in the case. Laws of 2000, ch. 92, § 1 (allowing DNA testing "if DNA evidence was not admitted because the court ruled DNA testing did not meet acceptable scientific standards or DNA testing technology was not sufficiently developed to test the DNA evidence in the case"); Laws of 2001, ch. 301, § 1 (same); Laws of 2003, ch. 100, § 1 (same).
¶ 15 But in 2005, the legislature broadened procedural requirements of the statute. Laws of 2005, ch. 5, § 1. As amended, RCW 10.73.170 permits a convicted person to seek DNA testing on the ground it "would be significantly more accurate than prior DNA testing or would provide significant new information." RCW 10.73.170(2)(a)(iii).
¶ 16 Riofta sought DNA testing under the amended statute. He alleged the test results "would provide significant new information." Id. The State opposed the motion. It argued "significant new information" means information that is newly available due to advances in technology and does not include information that could have been obtained at trial. The Court of Appeals held postconviction testing of the white hat could not yield "new" information because the white hat was not newly discovered evidence and could have been tested at trial. Riofta, 134 Wash.App. at 684, 142 P.3d 193.
¶ 17 The first issue presented here is whether Riofta's motion meets the procedural requirements for testing under the statute. The meaning of a statute is a question of law reviewed de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9, 43 P.3d 4 (2002). The fundamental objective of the court is to carry out the legislature's intent and give effect to the statute's plain meaning. Id. "`[T]he plain meaning rule requires courts to consider legislative purposes or policies appearing on the face of the statute [as well as] background facts of which judicial notice can be taken.'" Id. at 11, 43 P.3d 4 (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 48A:16, at 809-10 (6th ed.2000)).
¶ 18 Riofta claims the Court of Appeals' interpretation of the statute, restricting testing to evidence newly available due to advances in technology, is contrary to legislative intent discernible from the statute's plain language and legislative history. We agree. The plain meaning of the statute allows DNA testing based on either advances in technology or the potential to produce significant new information. As the Court of Appeals correctly recognized, "`than prior DNA testing' modifies only the antecedent phrase, `would be significantly more accurate,' and does not modify the phrase, `would provide significant new information.'" Riofta, 134 Wash.App. at 682, 142 P.3d 193 (quoting RCW 10.73.170(2)(a)(iii) and citing In re Welfare of A. T., 109 Wash.App. 709, 714, 34 P.3d 1246 (2001)).
¶ 19 Even before the 2005 amendment, RCW 10.73.170 provided a basis to request postconviction DNA testing where "significant new information" was unavailable at trial due to inferior technology. See former RCW 10.73.170 (allowing postconviction testing if "DNA testing technology was not sufficiently developed"). Thus, if "significant new information" in RCW 10.73.170(2)(a)(iii) means anything, it means something more than DNA evidence that could not have been obtained at trial.
¶ 20 Each subsection of section.170(2)(a) represents a distinct remedial purpose, allowing postconviction DNA testing when: (i) the court previously denied admission of test results; (ii) the DNA evidence was unavailable due to inferior technology; and (iii) current technology will yield more accurate results than those previously obtained or, if testing is requested for the first time, will produce significant new information. Read as a whole, the statute provides a means for a convicted person to produce DNA evidence that the original fact finder did not consider, whether because of an adverse court ruling, inferior technology, or the decision of the prosecutor and defense counsel not to seek DNA testing prior to trial.
*472 ¶ 21 We hold that Riofta's request for testing of the white hat is not precluded by the procedural requirements of the statute on the basis that it could have been, but was not, tested prior to the trial.[1]
¶ 22 The next issue is whether Riofta's request for testing met the substantive requirement of the statute. In contrast to the statute's lenient procedural requirements, its substantive standard is onerous. RCW 10.73.170(3) provides:
The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.[[2]]
(Emphasis added.)
¶ 23 Riofta argues that DNA testing will prove someone else wore the white hat at the time of the shooting. The Court of Appeals held that even if Riofta obtained favorable results, "an absence of his DNA in conjunction with a match of the DNA of a convicted felon in Washington," "[m]ore than one person in the car may have worn the hat," and the test results, therefore, "do not exonerate Riofta." Riofta, 134 Wash.App. at 685, 142 P.3d 193. While we agree that DNA test results excluding Riofta would not show the likelihood that he would demonstrate his innocence, to the extent that the Court of Appeals can be read to hold that Riofta was required to demonstrate his innocence on the basis of the test results alone, we do not agree.
¶ 24 In determining whether a convicted person "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis," a court must look to whether, viewed in light of all of the evidence presented at trial or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis. The statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, in combination with the other evidence, raise a reasonable probability the petitioner was not the perpetrator.
¶ 25 This analysis is also supported by the federal DNA testing statute, 18 U.S.C. § 3600(a). Our statute was drafted to qualify Washington for federal funding under the Justice For All Act of 2004. Pub.L. No. 108-405, 118 Stat. 2260, 2261-62. In order to qualify for funding under the act, Washington must provide postconviction DNA testing "in a manner comparable to" the federal postconviction DNA testing outlined in 18 U.S.C. § 3600(a). Pub.L. No. 108-405, 118 Stat. at 2285. Under the federal statute, an inmate can obtain postconviction DNA testing by showing, inter alia, that the testing "may produce new material evidence" that would "support a theory" of innocence and "raise a reasonable probability that the applicant did not commit the offense." 18 U.S.C. § 3600(a)(6), (8)(A), (B).
¶ 26 The purpose of both statutes is to provide a means for a convicted person to obtain DNA evidence that would support a petition for postconviction relief. United States v. Boose, 498 F.Supp.2d 887, 889-90 (W.D.Miss.2007) ("The Innocence Protection Act gives a defendant in the right circumstances the means to initiate tests which may prove that he is actually innocent of the *473 crime of his conviction."); see Holly Schaffter, Postconviction DNA Evidence, A 500 Pound Gorilla in State Courts, 50 DRAKE L.REV. 695, 713-14 (2002) (postconviction DNA statutes provide the "intermediate step" to gain access to testing that would supply the evidence necessary to obtain a new trial based on newly discovered evidence).
¶ 27 Comparable to the federal law, our statute requires petitioners to demonstrate that favorable DNA results could lead to the production of evidence that would raise a reasonable probability of innocence.[3] RCW 10.73.170(3) ("likelihood that DNA evidence would demonstrate innocence on a more probable than not basis." (emphasis added)).
¶ 28 To determine the probability that a petitioner could demonstrate his innocence with the aid of favorable DNA test results, courts must consider the evidence produced at trial along with any newly discovered evidence and the impact that an exculpatory DNA test could have in light of this evidence.[4]Boose, 498 F.Supp.2d at 889, 891-92 (because initial inculpatory DNA testing "merely bolstered the testimony of numerous witnesses" that defendant kidnapped and raped the victim, further DNA testing would not support defendant's "`I didn't do it'" theory or "raise a reasonable probability that the defendant is actually innocent."); United States v. Fasono, No. CRIM. 3:04-CR-34-WHB, 2008 WL 2954974, *7 (S.D.Miss. July 29, 2008) (assessing potential impact of exculpatory DNA results in light of "the other evidence produced at trial").
¶ 29 The dissenters argue that our interpretation of the substantive statutory standard is comparable to that for "granting a new trial based on newly discovered evidence" and is, therefore, too burdensome. Concurring in dissent (Chambers, J.) at 478; dissent (C. Johnson, J.) at 476. Though we do not agree that the standards are equivalent, the dissenters are correct that defendants seeking postconviction relief face a heavy burden and are in a significantly different situation than a person facing trial. Schlup v. Delo, 513 U.S. 298, 326 n. 42, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (a convicted person claiming innocence as the basis for postconviction relief must overcome a strong presumption of guilt); Herrera v. Collins, 506 U.S. 390, 399, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (a petitioner claiming innocence "does not come before the Court as one who is `innocent,' but, on the contrary, as one who has been convicted by due process").
¶ 30 As a species of postconviction relief not otherwise provided for, RCW 10.73.170(3) asks a defendant to show a reasonable probability of his innocence before requiring State resources to be expended on a test.
¶ 31 With this interpretation of the statute in mind, we analyze the trial court's application of the statutory standard for an abuse of discretion. See State v. Hardesty, 129 Wash.2d 303, 317, 915 P.2d 1080 (1996) (trial court's decision on motion for postconviction relief is reviewed for abuse of discretion). In light of the overwhelming evidence presented at trial, we cannot find that the trial court abused its discretion in denying Riofta's motion for DNA testing.
¶ 32 Testing the white hat could result in two favorable outcomes for Riofta: the absence *474 of his DNA and the presence of another person's DNA. The trial court reasonably concluded the absence of Riofta's DNA would not likely demonstrate his innocence on a more probable than not basis. The white hat belonged to the owner of the stolen vehicle and was worn by the shooter for a short time, perhaps only as long as it took to walk over from the curb and fire the gun. Moreover, Riofta's head was shaved. Just as the absence of his fingerprints would not be inconsistent with his guilt (according to the victim, the shooter wore gloves), the absence of his DNA on the white cap would not exclude him as the perpetrator.
¶ 33 The presence of a third person's DNA on the white hat is also unavailing. Any of a number of people besides the shooter could have worn the white hat at some time after the vehicle was stolen. Thus, the presence of another person's DNA on the hat does not mean that person likely was wearing the hat at the time of the shooting. See In re Pers. Restraint of Bradford, 140 Wash.App. 124, 130-31, 165 P.3d 31 (2007) (granting defendant's motion for a new trial on grounds that absence of defendant's DNA combined with the presence of someone else's DNA on a mask worn during a rape would be probative of the defendant's innocence: "In Riofta, the hat was merely present in a vehicle when it was stolen. It had not been modified by the perpetrator, and DNA evidence in the hat was not evidence that someone other [than] Mr. Riofta was the shooter."); Fasono, 2008 WL 2954974, at *7 ("Because there is no evidence that only the robber had worn the subject items, the Court finds that the presence of another individual(s)' DNA on those items would not raise a reasonable probability that that individual committed the crime, and Fasano did not.").
¶ 34 Riofta and amicus correctly argue that mistaken eyewitness identification is a leading cause of wrongful conviction. Brandon L. Garrett, Judging Innocence, 108 Colum. L.Rev. 55, 60 (2008) ("The vast majority of [studied] exonerees (79%) were convicted based on eyewitness testimony; we now know that all of these eyewitnesses were incorrect"). However, this is not a case where the defendant was unknown to the victim. Riofta and the victim lived in the same neighborhood and had known each other for years. Riofta visited the victim's home several times to meet with the victim's brother. Riofta and the victim used to play basketball together at a local park. When police arrived, the victim immediately identified Riofta by his first name and supplied an accurate description of his physical appearance. Shortly thereafter, the victim positively identified Riofta from a photo database.
¶ 35 The victim had a good opportunity to see the shooter. He testified that he recognized Riofta "right away" when Riofta came within two or three feet after getting out of the passenger side of the car and walking up to him. He saw Riofta's face "clearly." State's Resp. to PRP at 189, 201, 211. They exchanged words before Riofta pulled out a gun, allowing the victim to recognize his voice. He knew Riofta's first name, but not his last name. In denying the motion, the trial court observed the victim was a reluctant witness who had "a lot at risk" in testifying against Riofta, and the jury obviously "found him to be very credible." Verbatim Report of Proceedings (June 10, 2005) at 14.
¶ 36 In addition to this strong eyewitness testimony, the State presented evidence that Riofta had a motive for the shooting. The victim's brother was one of several individuals accused of participating in a notorious gang related shooting. The victim's brother agreed to plead guilty and testify against the others. Two of the defendants recently had assaulted the victim's brother in the courtroom. The police found newspaper clippings of the murder case in Riofta's home. Riofta told detectives the victim's brother "was a sucker for snitching on the [h]omeys, and that he deserved to get choked up in court for snitching on [Jimmie Chea]." State's Resp. to PRP at 255. The evidence showed that Riofta had a motive to assault the victim as an act of intimidation.
¶ 37 The stolen vehicle involved in the shooting was found just blocks away from Riofta's home.
¶ 38 In support of his motion, Riofta submitted a letter by the trial counsel for one of the defendants in the Trang Dai murder case. According to the affiant, her client told *475 her Riofta was innocent and he knew the identity of the real shooter. But he was unwilling to provide a name. The trial court properly gave no weight to this letter. It is unsworn hearsay made by someone with suspect motives who is unwilling to identify the third party. See Schlup, 513 U.S. at 332, 115 S.Ct. 851 (in evaluating probative force of newly presented evidence "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence"); Herrera, 506 U.S. at 423, 113 S.Ct. 853 (O'Connor, J., concurring) (posttrial affidavits casting blame on third parties "are to be treated with a fair degree of skepticism") (concurring in denial of federal habeas corpus relief from death sentence where petitioner failed to make a credible showing of actual innocence); Bell v. United States, 871 A.2d 1199, 1201 (D.C.App.2005) (as with motion for new trial based on newly discovered evidence, trial court may give no weight to recantation affidavit offered in support of a postconviction DNA testing request under the Innocence Protection Act, D.C.Code § 22-4131); State v. Wicker, 10 Wash.App. 905, 909, 520 P.2d 1404 (1974) (trial court did not abuse its discretion in disregarding an uncorroborated hearsay declaration casting blame on a third party).
¶ 39 Neither the absence of Riofta's DNA nor the presence of another's DNA on the white hat would raise a reasonable probability of his innocence. We hold that the trial court did not abuse its discretion in concluding the probative value of the DNA test results Riofta seeks would raise the likelihood that he could demonstrate his innocence on a more probable than not basis.

CONCLUSION
¶ 40 RCW 10.73.170 allows a convicted person to request DNA testing if he can show the test results would provide new material information relevant to the perpetrator's identity. However, a trial court must grant the motion only when the petitioner "has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).
¶ 41 In this case, the trial court properly concluded Riofta failed to satisfy the statutory standard, considering the strength of the eyewitness identification, the evidence of motive, and the limited probative value of the DNA evidence sought. Because the trial court did not abuse its discretion in denying Riofta's motion for postconviction DNA testing, we affirm.
WE CONCUR: GERRY L. ALEXANDER, C.J., SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, JJ., and BOBBE J. BRIDGE, J. Pro Tem.
C. JOHNSON, J. (dissenting).
¶ 42 The majority rewrites RCW 10.73.170, engrafting a burden from the court rule for newly discovered evidence. In doing so, the majority ignores the legislative intent underlying the statute and the plain wording of the statute. RCW 10.73.170(3) provides that the motion for postconviction DNA (deoxyribonucleic acid) testing shall be granted if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." This statutory directive is at issue in this case, and underlying the statutory interpretation is the question of what requirements must be met to have DNA evidence tested.
¶ 43 The legislature enacted RCW 10.73.170 to set the burden for postconviction DNA testing and not to establish requirements for a new trial. The legislature's intent with this statute is to provide postconviction DNA testing where doing so could potentially exonerate a convicted person. Obviously, testing will sometimes help a person if it later establishes his or her innocence. But sometimes it will not help. The intent of the statute is to provide for testing; the result of the testing is not the focus. In testimony supporting the 2005 amendments, it was noted that DNA testing "has been a remarkable tool for overturning wrongful convictions across the United States [and] helps to ensure that justice is administered correctly for those few people that have been convicted of crimes that they did not commit." *476 H.B. Rep. on Substitute H.B. 1014, at 4, 59th Leg., Reg. Sess. (Wash.2005).
¶ 44 But, here, the majority has created an extra burden to obtain postconviction DNA testing similar to that for newly discovered evidence. We have previously held that to warrant the granting of a new trial under CrR 7.5 on the ground of newly discovered evidence, it must, among other things, appear the evidence is such as will probably change the result if a new trial is granted. State v. Peele, 67 Wash.2d 724, 409 P.2d 663 (1966). The majority reasons the question here is whether postconviction DNA test results could actually exonerate a defendant. Majority at 473 n. 4. Not only is such a burden similar to that for newly discovered evidence, but the majority's restrictive reading and rewriting of the statute creates a burden inconsistent with the intent of the statute for requesting postconviction DNA testing. Such a burden ignores the fact that such results cannot be known until after the testing is completed.
¶ 45 The majority's reading of the statute to require a "could exonerate" standard is also inconsistent with the plain wording of the statute. Id. We have held if a statute is plain on its face, a court should not engage in judicial construction by adding language to the statute. See, e.g., Restaurant Dev., Inc. v. Cananwill, Inc., 150 Wash.2d 674, 682, 80 P.3d 598 (2003) ("a court must not add words where the legislature has chosen not to include them"). This statute is specific on what burden must be met and needs no construction.
¶ 46 RCW 10.73.170(3) expressly establishes the "burden" a person must show. It provides that the court shall grant the request for DNA testing if "the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." (Emphasis added.) Put otherwise, a convicted person must show that the DNA evidence creates a likelihood that the defendant's innocence is more probable with the evidence than it would be without the DNA evidence.
¶ 47 Instead of placing equal weight on the terms of RCW 10.73.170, the majority's focus is on the term innocence. Majority at 473 n. 4 ("The legislature's use of the word `innocence' indicates legislative intent to restrict the availability of postconviction DNA testing to a limited class of extraordinary cases where the results could exonerate a person who was wrongfully convicted of a crime." (emphasis added)). But the majority does not adequately support this focusing of the statute. Indeed, even the sponsors who presented the bill explained the substitute bill "changes the standard for granting a motion for postconviction DNA testing to a more probable than not likelihood that the DNA evidence would demonstrate innocence." H.B. Rep. on Substitute H.B. 2872, at 3, 58th Leg., Reg. Sess. (Wash.2004). While I agree the changes focused on by the majority are important, we should not discount the legislature's intentional inclusion of the term likelihood. By including the word likelihood in the statute, the legislature established a substantive requirement that the proposed evidence to be tested meet a sufficient level of potential relevance for the DNA evidence not a result requirement. Requiring Riofta to show the test would "could exonerate" him, focuses on the result and not the likelihood of demonstrating innocence on a more probable than not basis.
¶ 48 Courts presume the legislature did not include unnecessary language in the statute. Judd v. Am. Tel. and Tel. Co., 152 Wash.2d 195, 202, 95 P.3d 337 (2004) (no part of a statute should be interpreted as meaningless). In other words, the motion should be granted if the proposed evidence would likely place the defendant outside the class of people who could have committed the crime on a more probable than not basis.
¶ 49 Here, a likelihood is present that the DNA evidence from the hat would demonstrate Alexander Riofta's innocence on a more probable than not basis if the DNA of another person was found that then identified someone else as the true shooter. If the DNA test results were favorable to Riofta, it has the likelihood of demonstrating Riofta's innocence on a more probable than not basis. Such results would meet the substantive requirement for the grant of a motion for postconviction DNA testing. See RCW *477 10.73.170(3). Riofta's motion should have been granted, and DNA testing allowed.
WE CONCUR: RICHARD B. SANDERS and TOM CHAMBERS, JJ.
CHAMBERS, J. (concurring in dissent).
¶ 50 I write mainly to urge legislative intervention and clarification on an issue that is so central to our criminal justice system. It is both beyond doubt and profoundly disturbing that innocent people are convicted despite truthful witnesses, good lawyers, good juries, good judges, and fair trials. See generally Sophia S. Chang, Note, Protecting the Innocent: Post-Conviction DNA Exoneration, 36 HASTINGS CONST. L.Q. 285 (2009). Largely based on DNA (deoxyribonucleic acid) evidence, the "Innocence Project" alone has exonerated at least 223 wrongfully convicted men and women, including 17 who had been sentenced to death. Id. at 289.
¶ 51 I believeor at least, I hopethat wrongful convictions are extraordinarily rare. But they happen, and because they happen, we should be open to the claim of error. This is especially true as we become increasingly aware of the fallibility of confessions and eyewitness testimony, but still rely so strongly on this evidence in our criminal proceedings. See Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L.Rev. 891, 904 (2004); Bernal v. People, 44 P.3d 184, 190 (Colo.2002).[1] The dangers are exacerbated when children are involved, either as the witnesses or the accused. We know now that five boys under intense pressure wrongly confessed to beating and raping a woman in New York City. See Richard A. Leo et al., Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century, 2006 WIS. L.REV. 479, 480-85 (2006) (discussing the Central Park jogger case). We have reason to believe that, even in our own country and even in our own time, men have gone to prison and even death row on the strength of confessions wrought by torture. See John Charles Boger, Foreword: Acts of Capital Clemency: The Words and Deeds of Governor George Ryan, 82 N.C. L.REV. 1279, 1280 n. 10 (2004) (citing Abdon M. Pallasch et al., Gov. Ryan Empties Death Row of All 167, Chi. Sun-Times, Jan. 12, 2003, at 2). Judicial finality is a virtue but a vastly inferior one to actual substantive justice.
¶ 52 In response to this reality, 45 states have enacted postconviction DNA testing statutes. See Brandon L. Garrett, Claiming Innocence, 92 Minn. L.Rev. 1629, 1676 (2008). While these statutes differ in some areas, all adopt some level of outcome-based restrictions on granting relief. Id. The vast majority (38 of 45) require that anyone requesting DNA testing demonstrate that the test results would be "material" before testing is granted. Id. This materiality standard has been expressed in many states as requiring the petitioner to show "`a reasonable probability exists that the petitioner would not have been convicted if exculpatory results had been obtained through DNA testing.'" Id. (quoting as illustrative Ariz.Rev. Stat. Ann. § 13-4240 (2001 & Supp.2007)).[2] *478 The "reasonable probability" standard is a less stringent standard than a "preponderance of the evidence" standard. It has been defined as a "probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 669, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also State v. Crawford, 159 Wash.2d 86, 104-05, 147 P.3d 1288 (2006) (holding that the reasonable probability standard is less stringent than the standard for newly discovered evidence claims). In my view, this materiality standard appropriately balances the desire for finality against the need for accurate results. It is consistent with federal constitutional standards requiring the State to produce evidence "`if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481(1985) and discussing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)).
¶ 53 Unfortunately, the majority concludes that our legislature intended a higher standard for obtaining DNA testing than is required by most other jurisdictions. It essentially adopts our court rules standard for granting a new trial based on newly discovered evidencea standard steeped in the doctrine of finality and not an easy standard to meet. But Alexander Riofta has not requested a new trial; he has asked only to obtain evidence that may lead to a request for a new trial. To hold Riofta to the same burden of proof before testing has taken place makes little sense if, assuming favorable test results, he will be required to make the same showing in a subsequent personal restraint petition.
¶ 54 The standard should allow the petitioner to obtain testing if he can show that favorable test results will later demonstrate innocence on a more probable than not basis.[3] As I read the statute, only after testing has occurred is the petitioner required to show the DNA evidence will actually exonerate him. This interpretation is consistent with the legislature's desire to broaden the availability of postconviction DNA testing.
¶ 55 I would analyze this statute, and this evidence, against the agonizing fact that innocent people are convicted. In my view, if there is any serious reason to believe that some piece of tangible evidence could establish the innocence of the convicted man or woman, that evidence should be tested. As Judge Stephen Reinhardt put it, when there is evidence that could prove a convicted man is actually innocent, "fairness requires that on remand the state come forward with any exculpatory evidence it possesses." Thomas v. Goldsmith, 979 F.2d 746, 750 (9th Cir. 1992). We should not be afraid to be proved wrong. As a people, as a state, we are better than that. We should apply these rules liberally, and we should order the evidence tested here. I concur in dissent.
NOTES
[1] The Court of Appeals rejected this reading of the statute reasoning that giving "new information" a literal interpretation would result in the "strained or absurd consequence" that a defendant could adopt a "wait and see" approach, by trying to gain acquittal without the DNA evidence, and then moving for postconviction testing when that strategy fails. Riofta, 134 Wash. App. at 684, 142 P.3d 193. We disagree that this plain reading leads to absurd results. The failure to seek DNA testing at trial is a factor the trial court may take into account in deciding whether there is a "likelihood" the requested testing would demonstrate innocence on a more probable than not basis, see RCW 10.73.170(3), but it is not a per se bar to postconviction DNA testing.
[2] I respectfully disagree with the dissent by Justice C. Johnson, suggesting that RCW 10.73.170(3) is part of the pleading requirements of the statute. Dissent at 476. The pleading requirements are in section (2), which reads, "[t]he motion shall ... [s]tate." To make section (3) a pleading requirement ignores the structure of the statute and the legislature's requirement that the motion take "the form required by subsection (2)." RCW 10.73.170(2), (3) (emphasis added).
[3] As noted above, our statute does not allow defendants to adopt a "wait and see" approach. A defendant's failure to request DNA testing at trial of evidence he now claims to be exculpatory must be weighed against his claim of probable innocence unless circumstances exist to justify the failure. For example, another person may confess to the crime and identify physical evidence on which his DNA might be found. The defendant may have justifiably failed to request DNA testing of this evidence at trial.
[4] The legislature's use of the word "innocence" indicates legislative intent to restrict the availability of postconviction DNA testing to a limited class of extraordinary cases where the results could exonerate a person who was wrongfully convicted of a crime. See Sawyer v. Whitley, 505 U.S. 333, 340, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (to say a person is "innocent" means the State has convicted the wrong person of the crime).

Contrary to assertions by the dissenters, RCW 10.73.170 is not aimed at ensuring a defendant had a fair trial. Its purpose is to provide a remedy for those who were wrongly convicted despite receiving a fair trial. The inquiry therefore properly focuses on petitioner's innocence.
[1] The Colorado Supreme Court cited research that gives us particular reason to be concerned about eye witnesses' testimony in such circumstances. As it noted:

For example, a study of forty cases in which the convicted persons were later exonerated through DNA testing revealed that ninety percent (90%) of the convictions were obtained, at least in part, by erroneous eyewitness identifications. Gary L. Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 Law & Hum. Behav. 603, 605 (1998). The study concluded that "mistaken eyewitness identification is responsible for more of these wrongful convictions than all other causes combined," and that "eyewitness identification evidence is among the least reliable forms of evidence and yet is persuasive to juries." Id. The study further demonstrated that "accuracy of description is a rather poor predictor of identification." Id. at 608. A different study revealed that "recognition accuracy was found to be poorer when the perpetrator was holding a weapon." Vaughn Tooley et al., Facial Recognition: Weapon Effect and Attentional Focus, 17 J. of Applied Social Psychology 845, 854 (1987).
Bernal, 44 P.3d at 190.
[2] There are only four states that place a higher burden on petitioners seeking DNA testing. Colorado and Texas require petitioners to show by a preponderance of the evidence that test results would prove innocence. Garrett, supra, at 1676 n. 221 (citing Colo.Rev.Stat. § 18-1-413 (2007); Tex.Code Crim. Proc. Ann. art. 64.03(a)(2)(A) (Vernon 2006)). New Hampshire and Virginia require clear and convincing evidence that testing will demonstrate innocence before testing will be granted. Id. n. 222 (citing N.H.Rev.Stat. Ann. § 651-D:2(III) (2007); Va.Code Ann. § 19.2-327.1 (Supp.2007)). Conversely, three states require only that the petitioner show a likelihood that DNA test results could be probative of innocence. Id. n. 218 (citing Kan. Stat. Ann. § 21-2512 (2006); Neb.Rev.Stat. § 29-4120(5) (2006); Wyo. Stat. Ann. § 7-12-303 (effective July 1, 2008)).
[3] While I believe the statute is clear on this point, if the legislature would like to clarify its meaning in the wake of this opinion it might wish to amend RCW 10.73.170(3) to read:

The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the any reasonable likelihood that the DNA evidence would demonstrate innocence. on a more probable than not basis.
Such a change would make absolutely clear that the burden on a petitioner seeking postconviction DNA testing is less than the burden that he faces after test results have been obtained.