IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77446-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KEVIN JORY BRAA, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: July 22, 2019 |

ANDRUS, J. — A jury convicted Kevin Braa of first degree manslaughter, and this court affirmed his conviction and sentence. Braa now appeals the trial court's denial of his request for post-conviction DNA (deoxyribonucleic acid) testing of bullet fragments found at the crime scene. But Braa has failed to demonstrate that a favorable DNA test result would establish his innocence on a more probable than not basis. Thus, we affirm the trial court.

## FACTS

This court previously summarized the circumstances of Braa's conviction:

On the evening of November 11, 2006, Kevin Braa was sitting at the bar reading a book in Kuhnle's Tavern in Marysville. Simeon Whitney was there playing pool with his brother, Roger Enick, and a friend, Kenny Celestine. Whitney, Enick, and Celestine are Native American and went to Kuhnle's Tavern because it is a hangout for Native Americans.

Enick and another bar patron argued over a game of pool, and the other patron used racial slurs about Native Americans. At some point, Braa went over to the pool table and made offensive comments toward Enick. Whitney pushed Braa out of the way and told him,

"Leave my homeboy alone." Braa told Whitney, "Go back to Mexico where you belong. You're a sub-human." When the bartender heard this, she told Braa that he would be asked to leave if he continued to talk that way. Braa did not comply, so she escorted him to the back door. A minute or two later, Whitney went out through the same door.

A fight ensued between Whitney and Braa outside behind Kuhnle's Tavern. Witnesses saw Whitney repeatedly punch Braa and pull Braa's shirt up over his head. After the fight, Whitney started toward the back door of Kuhnle's, and Braa went over to his truck. Braa fired four to six shots at or toward the back door. Some witnesses saw Braa standing by his truck with the door open and his arm extended as he fired. Whitney staggered through the back door and collapsed by the bathrooms. When the bartender heard the gunshots and saw Whitney on the floor, she ducked down and called 911. Two witnesses saw Braa drive away in a white Chevy S-10 pickup.

A police officer who happened to be a few blocks away heard the gunshots and responded to the scene. Whitney had a pulse but was bleeding from the abdominal area and was nonresponsive. He was airlifted to Harborview and died en route. Later, an autopsy determined Whitney had suffered four gunshot wounds. The wounds showed that the bullets traveled from back to front through Whitney's body. One bullet and fragments from another were recovered from his abdomen. Another bullet exited through the front of his abdomen. The cause of Whitney's death was shock, trauma, and loss of blood due to the gunshot wounds.

Officers found bullet jacket fragments near where Whitney had lain. There were shell casings in the parking lot, as well as the book the defendant had been reading at the bar. Detectives recovered three bullets and bullet shrapnel from the back door area and the carpet just inside the back door. There were two indentations in the metal of the back door, which were consistent with bullet strikes. Detectives also located a bullet hole in an interior wall just inside the back door. Forensic analysis later confirmed that the bullet taken from Whitney's abdominal wall and the bullet found by the back door were fired from the same gun. The four shell casings found in the parking lot were compared and it was forensically determined that all had been fired from one gun.

Braa lived in a two-bedroom trailer that he shared with a roommate, Lenny Graff. Braa returned home around 10:30 on the night of the crime and asked Graff to get some beer, which Graff did. Graff recalled that Braa looked like he had been in a fight, with black eyes and a bloody nose. When Graff returned with the beer, Braa had

changed his clothes and no longer looked dirty or bloody. Graff asked what had happened, and Braa told him that he had "killed a subhuman." When Graff asked what a subhuman was, Braa responded, "It means if you're not white, you're not right." He told Graff he had been jumped by some Mexicans who wanted to steal his wallet. He refused to discuss further the topic of killing someone and asked Graff to lie and say he had been home all night.

That night, Braa parked his car several feet further from the roadway than he usually did, and he did not move it for the next three days. On November 14, 2006, officers arrived at Braa's trailer to execute a search warrant and arrest him. They could see Braa inside, through the kitchen window. They announced their presence over the patrol car PA systems. They also used a "hailer," a box equipped with a loudspeaker, a handle for throwing, and hundreds of feet of cable, to communicate with Braa. Several times, an officer announced, "Kevin Braa, this is the Sheriff's Office. We have a warrant for your arrest. Identify yourself and surrender," but Braa did not come out. Officers shone lights into the home, and a helicopter was also used to illuminate the area. After Braa failed to respond to repeated voice commands, officers deployed two pepper spray projectile canisters through a window of the trailer. Braa came outside a few seconds later, complied with officers' verbal instructions, and was taken into custody.

Four and a half months later, while doing yard work, Graff discovered a plastic garbage bag under the deck of the trailer. Inside, he discovered Braa's 9mm semiautomatic Ruger handgun. He called 911, and police picked up the gun. Forensic analysis confirmed that the bullet extracted from Whitney's abdominal wall had been fired from that weapon and that one of the four spent shell casings found in the parking lot had also been fired from that weapon. The other bullets and casings were not analyzed because it had already been determined that they had been fired from the same weapon as the tested bullet and casing. An expert in trajectory analysis testified that at least one bullet had been shot from a height of about four and a half feet, within 10 feet of where bullet fragments were imbedded in the wall inside the tavern. The evidence was consistent with the trajectory from a gun held by a person of average height while standing up.

At trial, Braa conceded that he shot the gun and argued that it had been in self-defense. He testified that he had a verbal exchange with some guys he thought were Mexican and that he had called them "Mexicans" and "sub-humans" and "invited them to go back to their own country." He recalled that the bartender had asked him to be

quiet and go sit down, and he testified that he did so. Shortly afterward, he left the bar through the back door and as he was leaving was hit over the head and lost consciousness. When he came to, he was being beaten by an unknown assailant. He did not fight back but tried to protect himself by curling up. He tried to get away but was beaten more and shoved to the ground. He thought he was going to be beaten until he was killed. After being slammed into a vehicle, he got his gun out and fired immediately. He testified that he was slumped, lying on the ground when he fired.

Braa was charged with second degree murder and, in the alternative, first degree manslaughter. The jury found Braa guilty of the alternate charge of first degree manslaughter.

State v. Braa, noted at 150 Wn. App. 1035, slip op. at 34-39 (2009).[1]

Nine years after his conviction, Braa filed two motions for post-conviction DNA testing under RCW 10.73.170, which provides that:

(1) A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.

(2) The motion shall:

(a) State that:

(i) The court ruled that DNA testing did not meet acceptable scientific standards; or
(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;

(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and

(c) Comply with all other procedural requirements established by court rule.

---

[1] Our Supreme Court subsequently denied Braa's petition for review. State v. Braa, 191 Wn.2d 1010, 424 P.3d 1225 (2018).

(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

(4) Upon written request to the court that entered a judgment of conviction, a convicted person who demonstrates that he or she is indigent under RCW 10.101.010 may request appointment of counsel solely to prepare and present a motion under this section, and the court, in its discretion, may grant the request. Such motion for appointment of counsel shall comply with all procedural requirements established by court rule.

Braa's first motion, filed on August 16, 2016, sought appointment of counsel and DNA testing of a drop of blood taken from the tavern parking lot the night Whitney was shot. Braa claimed that DNA testing would "provide new information about where [Whitney] was actually at when shot." Braa argued that if the blood belonged to Whitney, it would support his trial defense that he had shot Whitney in self-defense while Whitney was standing in close proximity over him. The trial court denied the motion.

Braa appealed, and in a published opinion, this court concluded that a favorable DNA test result of the blood drop would not establish Braa's innocence on a more probable than not basis. State v. Braa, 2 Wn. App.2d 510, 523, 410 P.3d 1176 (2018). It reasoned that even if Braa were entitled to a "favorable presumption" that a DNA test would reveal the blood belonged to Whitney, Braa was not entitled to the presumption that the existence of Whitney's blood in that specific location in the parking lot meant Braa shot Whitney in that location. Id. at 521. It noted that Whitney's blood could have ended up in that spot in a number of ways, including during the fist fight itself; it did not mean that Braa shot Whitney

in that location. Id. at 522. Thus, it concluded that the trial court had not abused its discretion when it denied Braa's motion.[2]

Braa's second motion, filed on May 8, 2017, sought DNA testing of "[b]ullet [j]ackets/[f]ragments" collected from the parking lot. Braa's motion referred to two specific bullet fragments, which were marked at the scene by placards 40 and 35 and were trial exhibit numbers 10 and 18, respectively. While the fragment marked by placard 40 was in the parking lot, the fragment marked by placard 35 was found by the back entrance to the bar. The fragment marked by placard 40 was next to the blood drop this court already deemed ineligible for post-conviction DNA testing. Braa, 2 Wn. App. 2d at 510.

Braa claimed that DNA testing of these bullet jackets or fragments "would provide new information about where [Whitney] actually was when shot, confirming Braa's claim of necessity due to self defense/imminent danger." The trial court once again denied the motion:

1. A) The defendant has failed to comply with the procedural requirements of RCW 10.73.170(2), because the identity of the shooter (defendant Kevin Braa) is undisputed.

    B) The defendant has failed to meet his substantive burden under RCW 10.73.170(3) because favorable DNA evidence, when considered along with all of the other evidence, would not demonstrate his innocence on a more probable than not basis.

2. The defendant's motion does not establish grounds for relief, so the Court in its discretion declines to appoint counsel for this issue.

Braa appeals.

---

[2] This court, however, concluded that the trial court erroneously concluded that Braa had not complied with the procedural requirements of RCW 10.73.170 (2)(b). Braa, 2 Wn. App. 2d at 520. We agree that in the present case, the trial court erroneously concluded that Braa's motion did not comply with RCW 10.73.170(2)(b).

ANALYSIS

We review a trial court's decision on a motion for post-conviction DNA testing for abuse of discretion. State v. Crumpton, 181 Wn.2d 252, 257, 332 P.3d 448 (2014). A trial court abuses its discretion if the decision rests on facts unsupported in the record or was reached by applying the wrong legal standard. Id.

In determining whether to grant a request for post-conviction DNA testing, a court should look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis. Id. at 260. To do so, courts must consider "the evidence produced at trial along with any newly discovered evidence and the impact that an exculpatory DNA test could have in light of this evidence." State v. Riofta, 166 Wn.2d 358, 369, 209 P.3d 467 (2009). Imposing a favorable presumption when deciding a motion for post-conviction DNA testing affects only whether the DNA will be tested; it does not affect whether the individual will be granted a new trial. Id. Moreover, "[o]btaining a DNA test is simply the first step on the journey for a new trial." Crumpton, 181 Wn.2d at 263.

Braa claims that DNA testing of the two bullet fragments from the crime scene would provide "independent evidence" that Whitney was nearby and in a position to continue attacking Braa when Braa shot him. Although Braa complied with the procedural requirements, Braa must also show that a favorable DNA result would prove his innocence on a more probable than not basis. Braa contends that

such DNA testing would bolster his self-defense claim, and by doing so, show a probability of innocence.

But we conclude that Braa fails, once again, to show that he is entitled to an inference that he acted in self-defense. While a petitioner is entitled to an inference of a favorable DNA result, he is not entitled to any further favorable presumptions. See Braa, 2 Wn. App. 2d. at 521-22 (even if a blood drop contained Whitney's DNA, Braa was not entitled to inference that blood proved Whitney was shot in that spot).

Here, Braa argues that had the police tested the bullet fragments located near the tavern's back door and fragments found out in the parking lot, and had these fragments tested positive for Whitney's DNA, that evidence would have established that Braa shot Whitney in self-defense.

But as we indicated in Braa's prior appeal, we cannot ignore the other evidence at trial when assessing whether a particular inference is a reasonable one. Even if Whitney's DNA were found on the bullet fragment near the tavern's back door (trial exhibit 18), this evidence would place Whitney exactly where witnesses observed him when Braa shot him. This evidence would have been no more helpful to Braa than the blood drop:

> But even assuming that the drop of blood found in the parking lot was Whitney's, the evidence introduced at trial strongly contradicts Braa's self-defense theory. The evidence established that Whitney had been shot in the back at least three times. It further established that the bartender heard a burst of gunshots contemporaneously with Whitney crashing through the rear door of the tavern, 30 feet away from where Braa was seen to have fired the gunshots. In addition, the evidence established that there was a great deal of blood in the area of the rear door of the tavern.

Braa, 2 Wn. App. 2d at 522. The evidence refuting Braa's self-defense theory was strong.

And Whitney's DNA on a bullet fragment found further away in the parking lot similarly fails to establish that Braa acted in self-defense. Forensic scientist Richard Wyant testified that shrapnel from bullets does not establish the shooter's location. He similarly testified that casings indicate the shooter's general location but "a lot of factors" go into where the bullet or cartridge casing will land. Similarly, Dr. Norman Thiersch, the Medical Examiner who performed Whitney's autopsy, noted that bullets can fragment after entering the body and exit the body in unpredictable locations after coming in contact with bone.

Finally, as this court pointed out in Braa's direct appeal and in his previous appeal, Braa's actions following the shooting did not support his self-defense claim. Evidence at trial demonstrated that Braa fled the scene of the crime and hid the gun under his deck. Lenny Graff, Braa's roommate at the time, testified that when Braa returned home from the tavern, Braa admitted to Graff that he had "killed a sub-human." Graff further testified that Braa had asked him to lie to the police and tell them that Braa was home all evening watching television. Graff further testified that on April 5, 2007, he found a black plastic bag buried in the flower bed beside the home's deck. The bag contained a Ruger nine-millimeter pistol. Graff called 9-1-1 to report the firearm, which matched the gun used to kill Whitney.

At trial, Braa admitted that he hid the gun under the deck at some point after that evening. He also admitted to throwing the shirt he was wearing that evening

behind the garbage. This court said that these actions supported "the State's theory that Braa had a guilty conscience arising from his slaying of Whitney. Such a guilty conscience is incompatible with Braa believing that he had acted in lawful self-defense by shooting Whitney." Braa, 2 Wn. App. 2d at 523.

Based on the evidence presented at trial, it is unlikely that, on a more probable than not basis, a favorable DNA test result on two bullet fragments would demonstrate Braa's innocence. Furthermore, Braa is not entitled to the inference that Whitney's DNA on the bullet fragments demonstrates that Whitney was nearby when he was shot. Without that inference, he cannot establish his innocence on a more probable than not basis. Thus, the trial court did not abuse its discretion when it denied Braa's post-conviction motion for DNA testing.

Affirmed.

WE CONCUR: