IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84260-9-I |
| Respondent, | |
| v. | DIVISION ONE |
| DEMEKO BRAZILLE HOLLAND a/k/a DEMEKO BRAZILE HOLLAND, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — In 2008, a jury convicted Demeko Holland of second degree murder with a firearm enhancement. Thirteen years later, in 2022, Holland filed a motion for postconviction DNA testing of the murder weapon, claiming that new techniques in rust removal warranted additional testing. The trial court denied the motion. Because Holland does not explain how the rust removal process would provide significantly more accurate DNA information than was obtained prior to trial nor explain how a favorable DNA test result would prove his innocence on a more probable than not basis, we affirm.

FACTS

On August 18, 2003, fourteen-year-old D.C. was riding his bike in West Seattle when he was shot and killed. Witnesses reported to police that the shooter was running through the residential area west of the shooting. Several individuals testified they had witnessed a "dark skinned" individual fleeing with varying physical descriptions. Seattle Police Officer Richard Heideman stopped

Citations and pin cites are based on the Westlaw online version of the cited material.

Demeko Holland about 10 blocks northwest of the shooting. Heideman reported that when stopped, Holland said, "Why did you stop me? I'm just out jogging." Officer Chris Hairston then arrived and asked Holland if he knew why he was being stopped. Hairston reported that Holland responded, "Is this about the shooting?" and then asked, "Is the kid all right?" One witness, Michael Anderson, saw the final shots fired and pursued the shooter who began to flee the scene. Officers brought Anderson to identify Holland, who was being detained and handcuffed. Anderson identified Holland as the shooter with 70 percent certainty.

After Holland was detained, Seattle Police Department Detectives Donna O'Neal and Rob Blanco questioned Holland, who admitted to being out late the night before with friends and smoking 9 to 12 sticks of "sherm."[1] When asked about the side effects of sherm, Holland explained that when his smoking was excessive, he suffered blackouts. He described it as being in a state of consciousness in which he was unable to account for any of his actions. When asked about the gun, Holland told Detective Blanco that it was possible his friend gave him a gun and that he did the shooting, but he could not remember. Detective Blanco described Holland as being "very moody" during questioning and recalled Holland telling him that he had "slipped up and that something happened and he felt bad for it." After Holland started crying during questioning, Detective O'Neal asked if Holland wanted to write a letter to the victim's family to

---

[1] "Sherm" is marijuana that has been dipped in either embalming fluid or PCP and dried.

express his remorse. Detective O'Neal said that Holland responded, "That's a good idea. Maybe I'll do it later."

Evidence found and collected along Holland's flight path included a jacket, pen, T-shirt, and bandana. DNA testing implicated Holland as a possible contributor to the DNA found on all four items. When asked about the jacket, Holland told the detectives that his brother had a similar jacket and that he might have taken it with him that morning. And when asked about the recovered T-shirt, Holland gave the same response.

Nearly two years after the shooting, a gun was discovered in a bush along Holland's flight path. The gun was severely rusted and corroded from having been outside and exposed to the elements for 20 months. The gun, magazine, and bullets were submitted to a fingerprint examiner, who did not find any evidence of fingerprints. The items were then delivered to forensic scientist, Amy Jagmin, who conducted a cursory visual examination and determined the gun was not suitable for DNA testing. Jagmin testified that DNA testing the gun would likely be unsuccessful due to environmental exposure, which "break[s] down DNA and cause[s] the outer surface of . . . hard metal pieces to rust and cause[s] inhibition to anything that may have been present." For this reason, the gun, magazine, and bullets were not examined further for DNA. The pieces were then sent to a ballistics expert, who compared the gun with casings found at the crime scene and determined the gun was the murder weapon.

The case proceeded to trial and a jury convicted Holland of second degree murder with a firearm enhancement and first degree unlawful possession of a

3

firearm. Holland's convictions were affirmed on direct appeal. In 2022, thirteen years after his conviction, Holland filed a motion requesting postconviction DNA testing of the gun. The trial court denied the motion and Holland appeals.

ANALYSIS

Holland contends that the trial court erred when it denied his motion for postconviction DNA testing of the gun. Because Holland fails to satisfy the statutory requirements for postconviction DNA testing, we disagree.

Under RCW 10.73.170, a person convicted of a felony currently serving a prison sentence may file a motion requesting DNA testing. The person requesting testing must then satisfy the statute's procedural and substantive requirements. RCW 10.73.170(2)-(3). The procedural requirement is "lenient." State v. Riofta, 166 Wn.2d 358, 367, 209 P.3d 467 (2009). The motion must (a) "state the basis for the request," (b) "explain the relevance of the DNA evidence sought," and (c) "comply with applicable court rules." Riofta, 166 Wn.2d at 364 (citing RCW 10.73.170(2)(a)-(c)). Postconviction DNA testing is allowed when: "(i) the court previously denied admission of DNA testing; (ii) the DNA evidence was unavailable due to inferior technology; and (iii) current technology will yield more accurate results than those previously obtained or, . . . will provide significant new information." Riofta, 166 Wn.2d at 366 (emphasis omitted) (citing RCW 10.73.170(2)(a)(i)-(iii)). After stating the basis of the request, the statute requires a defendant to explain "why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement." RCW 10.73.170(2)(b).

Unlike the lenient procedural standard, the substantive standard is "onerous." Riofta, 166 Wn.2d at 367. The substantive standard requires a defendant to show a "likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). The court evaluates the likelihood of innocence based on a presumption of favorable test results. State v. Crumpton, 181 Wn.2d 252, 262, 332 P.3d 448, 452 (2014). But the defendant is not "entitled to additional inferences in [their] favor beyond the assumption of favorable DNA test results." State v. Braa, 2 Wn. App. 2d 510, 521, 410 P.3d 1176 (2018). Rather, the " 'court must look to whether, viewed in light of all of the evidence presented at trial or newly discovered, favorable DNA test results would raise the likelihood that the person is innocent on a more probable than not basis.' " State v. Thompson, 173 Wn.2d 865, 872, 271 P.3d 204, (2012) (emphasis omitted) (quoting Riofta, 166 Wn.2d at 367 (citing RCW 10.73.170(3))). If the favorable results, in combination with other evidence, raise a reasonable probability the defendant was not the perpetrator, the court must grant the motion. Riofta, 166 Wn.2d at 367-68.

Finally, "[t]esting should be limited to situations where there is a credible showing that it could benefit a possibly innocent individual, not only because that is the goal of the statute but also to avoid overburdening labs or wasting state resources." Crumpton, 181 Wn.2d at 261 (internal citations omitted). We review a trial court's decision on a motion for postconviction DNA testing for abuse of discretion. Crumpton, 181 Wn.2d at 257 (citing Riofta, 166 Wn.2d at 370).

1. <u>Procedural Standard</u>

As a preliminary matter, the State contends that Holland waived his reliance on Section 1.29 of the Washington State Patrol Crime Laboratory Division, Firearms/Tool Marks Technical Procedures Manual (Firearms Manual) because he did not cite to it in his motion before the trial court. We disagree. The statute does not require the defendant to state what the technology is, only that technology exists that will produce more accurate DNA testing results.[2] RCW 10.73.170.

We now turn to whether Holland satisfied the procedural requirements of the statute. Holland alleges "current technology will yield more accurate results" because the Washington State Patrol Crime Laboratory (WSPCL) has "amended its procedure in DNA collection of rusty firearms." Holland further asserts testing the rusted gun is relevant "because there [was] no evidence adduced during trial that linked him to the murder weapon." We disagree and conclude that Holland did not satisfy the statute's procedural requirements because he did not explain the materiality of the DNA evidence to his case.

Holland's motion easily clears the first procedural hurdle—he plainly identifies the basis of his request as "technology [that] will yield more accurate results then those previously obtained." But his motion fails to meet the second procedural requirement—explaining the relevance of additional DNA testing. To

---

[2] In his opening brief, Holland cites to "WSPCL 1, 28" and proceeds to talk about rusted firearms. However, language about rusted firearms is found in section 1.29 of the Firearms Manual, not section 1.28. This is a nonissue. The State's briefing demonstrates that the State understood Holland was trying to cite to section 1.29 and Holland correctly refers to section 1.29 in his reply brief.

meet the relevance prong, Holland must "[e]xplain why DNA evidence is material to the identity of the perpetrator of . . . the crime." State v. Gray, 151 Wn. App. 762, 768, 215 P.3d 961 (2009) (citing RCW 10.73.170(2)(b)).

Gray is instructive here. In Gray, the court determined that the defendant met the relevance requirement because they explained the relevance of the new DNA testing in detail, noting that the new method made it possible to test "small amounts of previously untestable biological material contained in rape kits." 151 Wn. App. at 769. Unlike the defendant in Gray, Holland did not explain how the updated Firearms Manual would be relevant to DNA analysis of the gun.

Instead, Holland contends that because the procedural component of the statute does not "require[] a petitioner to divulge 'why and how' a test is relevant nor to 'grapple' with specific evidence," he has satisfied the requirement by citing to the Firearms Manual. We disagree. Though the procedural requirement is lenient, the defendant still has the burden of showing materiality. RCW 10.73.170(2)(b). And here, the section of the Firearms Manual that Holland relies on does not mention DNA at all; rather, it details the procedure for removing rust from firearms in order to restore the firearm. The section provides that the purpose of restoration is for test firing and recovering manufacturer information such as serial numbers—not DNA recovery. Firearms Manual § 1.29.

Moreover, the Manual instructs that the firearm should be thoroughly sprayed with a water-displacing product like WD-40®, soaked in penetrating oil and other de-rusting solvents, cleaned with a soda blaster, washed with gun

7

cleaning solvent, and so forth. Firearms Manual § 1.29. It is difficult to understand how any DNA would remain on the gun after following such a rigorous cleaning procedure, let alone yield more accurate DNA results than testing methods that were previously available. Without further explanation of why rust removal will allow detection of new DNA evidence, Holland has not demonstrated why these updated procedures are material to identifying the perpetrator. We conclude that he fails to satisfy the relevance prong of the statute.

### 2. Substantive Standard

Holland contends that exculpatory DNA results would exclude him as the perpetrator, and, in light of weak evidence presented at trial, this would prove his innocence on a more probable than not basis. We disagree. Even if there were a possibility the firearm would yield DNA and produce favorable results, it would not establish Holland's innocence.

Holland alleges that the cross-racial identification evidence of this case is weak. We acknowledge that the problematic nature of eyewitness testimony can lead to misidentification, and that misidentification increases substantially when the identification is cross-racial. However, there is other independent evidence in support of Holland's conviction. In addition to the eyewitness testimony, Holland's conviction was based on flight path evidence, Holland's proximity to the shooting, DNA found on clothing items discarded along the flight path, and inculpatory statements he made to police officers.

Officers found Holland at the end of that flight path,[3] and when they asked Holland if he knew why he was stopped, he asked if it was about the shooting and if the kid was all right. When talking to the police, he began crying and said he had slipped up and that something happened and he felt bad for it. According to Detective O'Neal, after she asked if Holland would feel better if he wrote a letter to the victim's family, he replied, "That's a good idea. Maybe I'll do it later."

Holland later refused to tell officers where the gun was, stating, "I could get charged with a weapon enhancement." Moreover, Holland was a possible contributor to DNA found on items discarded along the flight path—including a jacket, T-shirt, bandana, and pen. When asked about the jacket, Holland said his brother had a similar jacket and said that it was possible he took it with him that morning. And when asked about the recovered T-shirt, Holland said the same thing. Additionally, Detective Blanco said that during questioning Holland admitted "it was possible he was the person that [] did the shooting, but he couldn't remember." He also told the detectives that he was out late with friends the night before using sherm and that he might have received a gun from his friend but could not remember his actions while under the influence.

Holland relies on Thompson and Gray—both of which are rape cases—to contend that "[a]n exculpatory DNA test result [is] pertinent to show innocence on

---

[3] We recognize that a black person running from the police is not incriminating evidence in and of itself. And there is a long history in American society of attributing such behavior by black people as evidence of guilt due to stereotyping members of the black community as criminals. Here, the evidence is significant not because Holland was running, but because he was found at the end of the flight path seen by several witnesses.

a more probable than not basis when the identity of a lone perpetrator is in question." But these cases are not persuasive because both involved only one possible source of DNA. Thompson, 173 Wn.2d at 870; Gray, 151 Wn. App. at 775.

The present case is more analogous to Riofta. 166 Wn.2d at 358. In Riofta, the court held that exculpatory test results would not show innocence on a more probable than not basis when the limited probative value of the evidence sought was outweighed by other substantial evidence. 166 Wn.2d at 373. The court determined that the hat had low probative value, because it could have been worn by several individuals during and after the time of the incident. 166 Wn.2d at 370. Much like the hat in Riofta, here, the gun could have been handled by anyone when it was left outside in a bush for 20 months.

Indeed, the gun has likely been handled by several individuals before and after its discovery in 2005. Holland told police it was possible he got the gun from his friend; it was in the bushes for 20 months; it was handled by DNA scientists and taken apart and reassembled at a ballistics lab; it was handled and transported by the police; and it was also admitted at trial. And even if the gun was not compromised by the DNA of others, the absence of Holland's DNA and the presence of someone else's does not outweigh the substantial evidence incriminating Holland. Because Holland failed to show the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis, we conclude that he fails to satisfy the substantive requirement.

Because the trial court did not abuse its discretion in denying the motion for postconviction DNA testing, we affirm.

_____ Smith, C.J.

WE CONCUR:

_____     _____
Birk, J.                    Chung, J.