# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. KEBEDE B. ABAWAJI, Appellant. | DIVISION ONE No. 81867-8-I UNPUBLISHED OPINION |

DWYER, J. — Kebede Abawaji appeals from the superior court's order denying his motion for postconviction deoxyribonucleic acid (DNA) testing and appointment of counsel under RCW 10.73.170. Abawaji contends that the superior court erred by denying his request for postconviction DNA testing because a favorable DNA test would demonstrate his innocence on a more probable than not basis. In advancing this contention, Abawaji asserts that the superior court erred by denying this request because it was unfamiliar with the trial record and misunderstood the contested issues at trial. In addition, with regard to the denial of his request for appointment of counsel, Abawaji asserts that the superior court erred by not finding him to be "indigent," as defined by RCW 10.101.010, or appointing counsel. Because the superior court did not err by denying either of Abawaji's requests, we affirm.

I

Kebede Abawaji and Tigist Belte were married in Ethiopia in 1999 and moved to the United States in 2003. By 2014, the couple was legally separated. However, Abawaji was allowed to visit Belte's home at will in order to visit his four children.

On November 1, 2014, Abawaji and Belte were at Belte's home when Abawaji became angry and an argument ensued. At one point, Abawaji grabbed Belte by the neck, threw her onto a bed, choked her, and threated to kill her. Belte was able to wrestle free, at which point Abawaji approached her with a kitchen knife. Belte retreated outside of the home and her oldest son, Olifa, was able to get the knife away from his father. Abawaji was subsequently arrested. However, the charges were dismissed when Belte did not appear for trial.

In February 2015, Abawaji and Belte officially divorced. After the divorce, Abawaji became concerned that Belte had become romantically involved with another man. Abawaji's concern grew to the point that he placed an audio recording device in Belte's car and a video recording device in her home. Soon thereafter, Belte signed a "contract," drafted by one of her sons, in which she promised not to have relationships with other men.

Abawaji testified that, pursuant to a tradition in the Oromo culture, of which he is a member, when a married woman takes a lover, "one of the men need to go – going to kill each other. That's for sure, that's for sure. So I was afraid, I was scared." He went on to explain that, essentially, the tradition requires that the new lover and his friends and family try to kill the woman's husband.

2

On April 1, 2015, Abawaji encountered Belte outside of her home. Belte testified that Abawaji came up from behind her and, when she turned around, she saw him holding an object that "look[ed] like . . . a hammer." Belte further testified that Abawaji then struck her in the head with the hammer, causing her to fall and lose consciousness. Abawaji then telephoned 911 and informed the dispatcher that he had hit Belte with a hammer:

> CALLER: Uh, I hit my—my wife.
> OPERATOR: You hit your wife?
> CALLER: Yes.
> . . .
> OPERATOR: Okay you hit her with your car or you hit her intentionally with your fist? What are you saying?
> . . .
> CALLER: with a hammer.
> . . .
> OPERATOR: hammer?
> CALLER: Yes. In her head. Because she pissed me off.

When Seattle police officers arrived at Belte's home, Abawaji immediately surrendered to them and identified Belte as "his wife." He informed the officers that Belte had broken their "contract" by "sharing his bed" with another man. Abawaji then directed the officers to the location of the hammer, which was in the trunk of his car. Abawaji was recorded on police in-car video footage acknowledging his Miranda[1] rights. Abawaji then admitted to the officers that he hit Belte with a hammer:

> OFFICER: What did you hit her with?
> MR. ABAWAJI: With a hammer.
> OFFICER: Where's the hammer?
> MR. ABAWAJI: I threw it over -- you want to know where? It's under the – under the (inaudible).
> OFFICER: Under the car?
> MR. ABAWAJI: In the car, in the car.

---

[1] Miranda v. Arizona, 384 U.S. 436, 88 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

OFFICER:  In this car?
MR. ABAWAJI:  Yeah
OFFICER:  Or in your car?
MR. ABAWAJI:  In my car.
OFFICER:  Red one? In your car. Can we get it out of your car?
MR. ABAWAJI:  Yeah.

Belte sustained severe injuries.  Upon arrival at the emergency room at Harborview Medical Center, she was intubated and entirely unresponsive.  The attending physician found multiple depressed skull fractures, which were described as "bleeding dents to her skull."

At trial, Abawaji pleaded self-defense, claiming that he was in fear for his life.  Abawaji claimed that he became aware of a plan to kill him through a recording made on the video device that he had placed in Belte's home.

Abawaji also claimed that, on the date of the incident, he confronted Belte with this recording and she became angry and forced him out of the house.  He further testified that, after being forced out of the house, Belte grabbed him and he pushed her away.  They then both fell to the ground, with Abawaji landing on top of Belte.  According to Abawaji, Belte hit her head on the ground when she initially fell, and then proceeded to stand up and fall again two or three more times.  Abawaji testified that he then telephoned 911 and informed the operator that he had hit Belte with a hammer "[s]o they [would] come quickly."  Abawaji also testified that he maintained this story with the responding officers because, in Ethiopia, the "police beat you up to death" for lying.

The hammer in question was never submitted for DNA testing.  In October 2015, Abawaji was convicted of attempted murder in the second degree while armed with a deadly weapon and felony harassment – domestic violence.  The

4

trial court imposed a standard-range sentence of 201 months of incarceration, which included a 24-month deadly-weapon enhancement.  Abawaji's judgment and sentence was affirmed on direct appeal.  State v. Abawaji, No. 74256-6-I, slip op. at 11 (Wash. Ct. App. Mar. 6, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/742566.pdf.

In August 2019, Abawaji mailed a written request to the superior court for postconviction DNA testing of the hammer pursuant to RCW 10.73.170, as well as appointment of counsel under RCW 10.73.170(4).  Over the next year, Abawaji attempted, several times, to request a hearing on his motion.  In July 2020, the superior court denied Abawaji's request for postconviction DNA testing and declined to appoint counsel to prepare and present the motion.

Abawaji appeals.

II

Abawaji contends that the superior court erred by denying his motion for postconviction DNA testing under RCW 10.73.170.  According to Abawaji, the superior court should have granted this motion because a favorable DNA test result would demonstrate his innocence, on a more probable than not basis.  We disagree.

A

We review a trial court's ruling on a motion for postconviction DNA testing for abuse of discretion. State v. Crumpton, 181 Wn.2d 252, 257, 332 P.3d 448 (2014). A trial court abuses its discretion if the decision rests on facts unsupported by the record or was reached by applying the wrong legal standard. Crumpton, 181 Wn.2d at 257.

B

RCW 10.73.170 provides a mechanism for individuals to seek DNA testing in order to establish their innocence. Crumpton, 181 Wn.2d at 258. In relevant part, RCW 10.73.170 provides:

> (1) A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.
> (2) The motion shall:
> (a) State that:
> (i) The court ruled that DNA testing did not meet acceptable scientific standards; or
> (ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
> (iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
> (b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
> (c) Comply with all other procedural requirements established by court rule.
> (3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

RCW 10.73.170.

The statute has both procedural and substantive requirements. Crumpton, 181 Wn.2d at 258. The procedural requirements are lenient. State v. Riofta, 166 Wn.2d 358, 367, 209 P.3d 467 (2009). By contrast, the "substantive standard is onerous." Riofta, 166 Wn.2d at 367.

Because the State concedes that Abawaji has met his procedural burden, these requirements need not be discussed further. At issue is the substantive portion of the statute, which requires the convicted person to show "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

"In determining whether a petitioner has satisfied this requirement, our Supreme Court has instructed that the petitioner is entitled to the 'favorable presumption' of an 'exculpatory DNA test result.'" State v. Braa, 2 Wn. App. 2d 510, 520, 410 P.3d 1176 (2018) (quoting Crumpton, 181 Wn.2d at 260). However, in considering the petitioner's motion under subsection (3), the court

> should not ignore the evidence from trial. It must look at DNA evidence in the context of all the evidence against the individual when deciding the motion. Riofta, 166 Wn.2d at 368. It is only within the context of the other evidence that the court can determine whether DNA evidence might demonstrate innocence.

Crumpton, 181 Wn.2d at 262 (footnote omitted).

Accordingly, we "look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis." Crumpton, 181 Wn.2d at 260.

An exculpatory DNA test result can be useful to show innocence on a more probable than not basis when the identity of a lone perpetrator is in

question.  For example, in State v. Gray, the court held that the defendant, who had been convicted of rape and attempted rape of two teenage girls, was entitled to postconviction DNA testing because it was undisputed that there was only one perpetrator.  151 Wn. App. 762, 774, 215 P.3d 961 (2009).  If the new DNA evidence excluded Gray as the source of the DNA, then his innocence was likely on a more probable than not basis.  Gray, 151 Wn. App. at 774.  Similarly, in State v. Thompson, our Supreme Court held that, in a situation in which the identity of the lone perpetrator is in question, DNA testing will either exculpate or inculpate the defendant.  173 Wn.2d 865, 876, 271 P.3d 204 (2012).  However, in this case, whether Abawaji was the perpetrator is not seriously at issue.

Abawaji's motion requesting postconviction DNA testing states that the hammer, "if tested would prove that it was not used in the assault."  Abawaji further claimed that, "[h]ad [his] attorney believed that he told 911 that he hit his wife with a hammer for the sole purpose of getting them to respond to the scene faster, he would not stand convicted, and had an actual defense."

Abawaji was convicted of attempted murder in the second degree with a deadly weapon enhancement.  The elements of murder in the second degree are provided in RCW 9A.32.050, which states, in relevant part:

> (1) A person is guilty of murder in the second degree when:
> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person.

RCW 9A.32.050(1)(a).

8

Moreover, "[a] person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1).

Additionally, Abawaji's sentence included a deadly weapon enhancement, which required a finding that "the offender or an accomplice was armed with a deadly weapon other than a firearm." RCW 9.94A.533(4).

Abawaji claims that a favorable DNA test result (specifically, a test disclosing none of Belte's DNA on the hammer) would necessarily mean that he did not use the hammer to attack Belte. However, "neither our Supreme Court nor this court has held that a petitioner is entitled to additional inferences in his favor beyond the assumption of a favorable DNA test result." Braa, 2 Wn. App. 2d at 521. In other words, we are not obligated to accept the petitioner's theory for what a favorable DNA test result means. See Braa, 2 Wn. App. 2d at 522 (stating that the defendant was not entitled to the favorable inference that the presence of the victim's blood in the parking lot necessarily meant that the defendant acted in self-defense, especially in light of the other available inferences and the great weight of the evidence); see also Riofta, 166 Wn.2d at 370 (stating that a lack of the defendant's DNA, or the presence of someone else's, on the hat of the shooter, which was left at the scene of the crime, was not evidence of defendant's innocence).

As expressed in Abawaji's motion, a favorable DNA test result would show only a lack of Belte's DNA on the hammer. Assuming this favorable DNA test result and considering the evidence presented at trial, the record supports the

superior courts conclusion that Abawaji did not establish that a favorable test result would demonstrate his innocence on a more probable than not basis.

In ruling on the motion for postconviction DNA testing, the superior court reasoned:

> A lack of DNA evidence connected to his wife on the hammer, presuming the result of a test would produce this "favorable" result for Mr. Abawaji, would not demonstrate that he did not use either this hammer or a deadly weapon in the assault on his wife. . . . [H]is wife testified to the attack with a hammer. The defendant admitted the same to law enforcement. This evidence strongly supports the sentencing enhancement with or without the actual hammer, and with or without any DNA evidence on that hammer. Moreover, the jury was aware that there was no DNA evidence from the hammer. The jury convicted Mr. Abawaji and returned a special verdict finding that Defendant was armed with a deadly weapon notwithstanding a lack of DNA evidence. A test today would only confirm what the jury knew: the State had no DNA evidence from the hammer. This result would fail to raise the likelihood that Mr. Abawaji did *not* use a deadly weapon on a more probable than not basis.

The superior court did not abuse its discretion by denying Abawaji's motion for postconviction DNA testing. Abawaji contends that a lack of Belte's DNA on the hammer would necessarily show that "no hammer was used," and that he is innocent. Not so. Even if the hammer is devoid of Belte's DNA, Abawaji's desired conclusion does not necessarily follow, as there remains overwhelming evidence that Abawaji did, indeed, hit Belte with a hammer. The evidence established that Abawaji himself telephoned 911 and reported that he had hit Belte with a hammer because she "pissed [him] off." It further established that Abawaji confessed to the responding officers that he had struck Belte with a hammer. In addition, Belte testified that Abawaji attacked her with a hammer. And a hammer was found by the police in the exact location at which Abawaji

10

told them it would be found. Moreover, Belte's attending physician testified that Belte had suffered multiple depressed skull fractures to different parts of her head, which the doctor described as "bleeding dents."

Furthermore, during closing argument, Abawaji's attorney acknowledged the lack of DNA evidence on the hammer, asking "[w]here is the blood on the hammer? Find the hammer. There is no blood." His defense counsel also stated, "What they haven't proven to you is that their weapon has absolutely no forensic or scientific evidence of her DNA or any blood or anything of that matter." His attorney concluded the closing argument by declaring to the jury that the "State did not investigate this case to the full extent they should have and didn't present you with the evidence that would convince you beyond a reasonable doubt that the hammer was the weapon that was used and that the hammer . . . was used multiple times to hit Ms. Belte."

Thus, Abawaji already argued to the jury that Belte's blood was not on the hammer. Furthermore, if DNA testing were to be performed, Abawaji would lose the benefit of the inference that the police conducted an incomplete investigation of the crime. In such a circumstance, as the superior court observed, the jury would know no more than what it already knew.

Not to be deterred, Abawaji next contends that the superior court erred by denying his motion for postconviction DNA testing because it was unfamiliar with the trial record.[2] According to Abawaji, the superior court presumed that there

---

[2] Judge Averil Rothrock was appointed to Department 16 of King County Superior Court in October 2018 to replace Judge John Chun, who presided over Abawaji's trial, upon Judge Chun's appointment to this court.

11

was no conflict at trial over Abawaji's use of a hammer. Again, we disagree. As Abawaji also recognizes, the superior court, in ruling on this motion, reviewed our decision entered on direct appeal. Notably, that decision reads, in part:

> Abawaji also asserts that the jury should not have relied on his statement to law enforcement officers because those statements were made in fear due to his cultural background. Abawaji testified he lied to the 911 operator about the hammer to get help to Belte faster. He said that he did not change his story when officers arrived on scene because he did not want officers to assault him. He stated that "in [his] country, police beat you up to death.". . . . He stated that he did everything the police wanted because he did not want to get beat. The jury considered his testimony on these issues and rejected it. Because we do not reweigh evidence on appeal, we reject Abawaji's claim.

Abawaji, No. 74256-6-I, slip op. at 10 (footnote omitted).

It is clear that the superior court was well aware of Abawaji's trial testimony and the evidence that was presented against him.

On a more probable than not basis, a favorable DNA test result (that the hammer does not have Belte's DNA on it) when considered alongside the evidence presented at trial would not demonstrate that Abawaji is more likely innocent than not. Therefore, the superior court did not abuse its discretion by denying the motion for postconviction DNA testing.

Accordingly, Abawaji's assignment of error fails.

III

Abawaji next contends that the superior court erred by not appointing counsel for the purpose of preparing and presenting the motion for postconviction DNA testing, as allowed by RCW 10.73.170(4). According to Abawaji, the superior court erroneously found that he was not indigent. Because Abawaji fails

12

to establish that the superior court abused its discretion by denying his request, his claim fails.

We review a trial court's ruling on a motion for postconviction DNA testing for abuse of discretion. Crumpton, 181 Wn.2d at 257. A trial court abuses its discretion when "'no reasonable judge would have made the same ruling.'" State v. Burke, 196 Wn.2d 712, 741, 478 P.3d 1096 1096 (2021) (internal quotation marks omitted) (quoting State v. Ohlson, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007)), cert. denied, 2021 WL 4508294 U.S. Wash. (Oct. 4, 2021).

The statutory considerations for appointing counsel are as follows:

> Upon written request to the court that entered a judgment of conviction, a convicted person who demonstrates that he or she is indigent under RCW 10.101.010 may request appointment of counsel solely to prepare and present a motion under this section, and the court, in its discretion, may grant the request. Such motion for appointment of counsel shall comply with all procedural requirements established by court rule.

RCW 10.73.170(4).

There are two steps to appointing counsel provided by this statute: (1) demonstration of indigence, and (2) the court's exercise of discretion to appoint or not appoint counsel.

The superior court concluded that Abawaji failed to show that he was indigent. Additionally, the superior court concluded that, even if Abawaji had made a showing of indigence, it would have nevertheless denied the motion. In so ruling, the superior court observed that Abawaji "prepared a motion and it sufficiently describes his theory and request." As such, the superior court ruled that, the "appointment of an attorney would not significantly advance Mr.

13

Abawaji's motion and that the theory and grounds for which he seeks attorney assistance do not warrant appointment."

Abawaji fails to demonstrate that no reasonable judge would have made the same ruling. The superior court was aware of the basis for Abawaji's request. It ruled that Abawaji had successfully communicated what he desired and why he should succeed to the court. As the superior court's order states, "[a] lack of DNA evidence connected to [Belte] on the hammer, presuming the result of a test would produce this 'favorable' result for Mr. Abawaji, would not demonstrate that he did not use either this hammer or a deadly weapon in the assault on [Belte]."

The superior court understood Abawaji's request and his basis for making it. The superior court reasonably concluded that appointment of counsel was not necessary to aid Abawaji in his request. There was no abuse of discretion.

Accordingly, Abawaji's assignment of error fails.

Affirmed.


_____ Dwyer, J.


WE CONCUR:

_____   _____
Coburn, J.        Mann, C.J.


14