IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 81305-6-I |
| SCOTT LINDSAY HALFHILL, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

COBURN, J. — Petitioner Scott Halfhill was found guilty of murder in the second degree and felony murder. He appealed his convictions, and we affirmed. He now files this personal restraint petition (PRP) alleging that his counsel was ineffective for not proffering evidence of an other suspect and the evidence was insufficient to sustain a conviction of murder in the second degree. Contending that a post-conviction DNA[1] test would probably show his innocence, Halfhill also requests a reference hearing. Because he has not established a basis for relief, we dismiss his PRP and deny his request for a reference hearing.

FACTS

The circumstances of the crime in this case are described in detail in this court's disposition of Halfhill's direct appeal, which we will not repeat here. State

_____

[1] Deoxyribonucleic acid.

Citations and pin cites are based on the Westlaw online version of the cited material

v. Halfhill, No. 77246-5-I, (Wash. Ct. App. Dec. 10, 2018) (unpublished), 772465.pdf (wa.gov).  We provide here only a brief description of the events relevant to the issues presented.

Don Meyer lived in a one bedroom apartment in the Ballard neighborhood of Seattle where he sold drugs to friends and acquaintances.  Halfhill, No. 77246-5-I, slip op. at 1.  His friends last heard from him on June 17, 2011.  Id.  Individuals testified that Scott Halfhill had moved into Meyer's apartment before Meyer disappeared.  Id.  Meyer's neighbor saw Halfhill playing with a taser in his van and saw him in and out of Meyer's apartment or heard him talking to Meyer every day, and sometimes they were heard arguing.  Id. at 2, 9.  Another neighbor once heard Halfhill tell Meyer that "nobody was going to F [sic] with him" at the same time she heard a taser go off.  Id. at 9.

On July 6, detectives found Meyer's apartment haphazardly painted, and they detected blood on the lower, unpainted portion of the wall and a circular paint stain on the concrete floor.  Id. at 2.  Two days later, Meyer's torso was found in a black garbage bag on a conveyor belt at a recycling center in south Seattle.  Id. at 3.  The torso and recycling bin on the conveyor belt were traced to a house demolition site a few blocks from Meyer's apartment.  Id. at 7-8.

On December 10, 2011, people who provide services to the homeless discovered some of Meyer's missing body parts, including Meyer's skull, in plastic garbage bags underneath the Ship Canal Bridge in the Eastlake neighborhood.  Id. at 8.  The area was commonly occupied by the homeless.  Four months earlier, Halfhill's van was towed from Eastlake Avenue East.

2

Examination of the skull suggested blunt force trauma possibly caused by a baseball bat.

Testing by the Washington State Patrol Crime Lab determined that a blood swab recovered from Meyer's bedroom wall matched Meyer's DNA profile. A swab from the large circular paint stain on the bedroom floor was confirmed to be human blood but was so degraded that no DNA comparisons could be made. A swab from the hallway carpet was a mixture of profiles but the major contributor was Halfhill. Forensic scientist Kari O'Neill also examined samples taken from Meyer's fingernails in order to determine whether there was DNA present that was foreign to the victim. The sample tested positive for blood, but O'Neill only obtained trace DNA evidence with limited genetic information such that no comparisons were possible. Id. The sample was consumed in the testing. Id.

At trial in May 2017, Halfhill's defense counsel submitted an offer of proof pertaining to admitting evidence of an other suspect—Ron Varney. Id. at 4. "Halfhill's proffered evidence relate[d] to Varney's attempt to sell Meyer morphine pills, Varney's violent tendencies, and statements Varney made regarding Meyer and saws." Id. at 14. Halfhill stated in his offer of proof that a witness, Martin Holloway, would testify that Varney met up with Meyer sometime between June 9 and June 17. Id. Holloway knew Varney had violent tendencies and told defense counsel that when Varney was referencing Meyer, he stated, "[Y]ou will never see him again," and added that Meyer would be easy to mug. Id. After Varney learned of Meyer's death, he told Holloway he had a sword. Id. After

3

Holloway asked Varney how one cuts someone up with a sword, Varney responded, "you use saws to cut people up." Id.

The trial court determined that nothing in the proffered evidence placed Varney in close proximity to the crime, specifically because Varney was absent in the June 17th to 18th period. Id. at 7. On appeal, we affirmed the trial court's exclusion of the proffered other suspect evidence related to Varney. Id. at 15. We explained that "Halfhill's proffered evidence may suggest that Varney had the motive to commit the crime, because his deal to sell morphine pills to Meyer did not go through. But, even if credited by the jury, the proffered evidence does not establish that Varney had the opportunity or the means to commit the crime." Id. at 16-17.

This petition focuses on claims, for the first time, of another other suspect, Brian Raymond, someone who the parties were aware of at the time of the first trial. On December 14, 2011, and December 14, 2012, police conducted interviews with Raymond. In his December 2011 interview, Raymond stated he was friends with Halfhill for about 10 years, and he lived with Meyer in his apartment for about a week and a half in early June 2011. As of December 2011, Raymond lived under the Ship Canal Bridge.

In Raymond's interview, the detectives asked him if he knew how Meyer died. Raymond shook his head. The detectives asked, "You don't know?" Raymond paused and asked, "a baseball bat?" When asked why he would say that, Raymond proceeded to tell the detectives that he had heard that Meyer got his head "beat off," and he guessed it was done with a baseball bat. After the

4

detective asked him how he knew that, he said he was not present during the attack, but a "weird looking dude" named "Mr. President" told him. When Raymond was interrogated again in December 2012, detectives asked again about the baseball bat, but Raymond claimed he did not remember telling them that—he had heard of Meyer's demise from "Mr. President." Raymond later told the detectives he did not know about the baseball bat, but only told them earlier that Meyer had a baseball bat. The detectives collected Raymond's DNA that he provided voluntarily, but it was not sent to a lab for testing, and Raymond passed away in May 2013—four years before trial.

In preparation for trial, defense counsel filed a motion to subpoena Raymond's prison record to investigate a potential defense theory that he may be an other suspect.

Following trial in June 2017, a jury convicted Halfhill of murder in the second degree. The court imposed a high-end, standard range sentence of 220 months in prison.

Halfhill timely appealed with multiple claims, including that the evidence was insufficient to support a conviction of murder in the second degree and that the trial court abused its discretion in not admitting other suspect evidence related to Varney. Id. at 5, 12. We affirmed his convictions. Id. at 1. The Washington State Supreme Court denied review. State v. Halfhill, 193 Wn.2d 1005, 438 P.3d 123 (2019).

On April 17, 2020, Halfhill filed the following PRP.

DISCUSSION

Standard of Review

Collateral relief from a conviction is an extraordinary remedy that seeks to disturb a final judgment.  In re Pers. Restraint of Finstad, 177 Wn.2d 501, 506, 301 P.3d 450 (2013).  Generally, a petitioner cannot raise issues previously addressed on direct appeal, and "new issues must meet a heightened showing before a court will grant relief."  In re Pers. Restraint of Yates, 177 Wn.2d 1, 17, 296 P.3d 872 (2013).  Because Halfhill is claiming relief on the basis of trial court error, he must demonstrate that he was actually and substantially prejudiced as a result of constitutional error or that the trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice.  In re Pers. Restraint of Swagerty, 186 Wn.2d 801, 807, 383 P.3d 454 (2016); Finstad, 177 Wn.2d at 506; Yates, 177 Wn.2d at 17.

We have "three available options when reviewing a personal restraint petition: (1) dismiss the petition, (2) transfer the petition to a superior court for a full determination on the merits or a reference hearing, or (3) grant the petition." Yates, 177 Wn.2d at 17.

Ineffective Assistance of Counsel

Halfhill contends for the first time on appeal that he received ineffective assistance of counsel because his counsel did not present evidence of Raymond as an "other suspect."  We disagree.

The State argues this claim is procedurally barred because Halfhill's direct appeal addressed "the same claim below vis-à-vis Ron Varney."  It argues that

"although technically different, the 'facts' underlying the proffer of Varney as the other suspect at trial are surprisingly similar to what Halfhill now claims for Raymond."  However, this is a different claim.  In Halfhill's direct appeal, we did not address whether his counsel was ineffective for not attempting to proffer evidence of an other suspect.  Halfhill, No. 77246-5-I, slip op. at 6-7.  We discussed whether the trial court abused its discretion by refusing to allow him to present probative evidence suggesting that another person (Varney) killed Meyer.  Id.  Raymond is a different alleged other suspect than Varney, and the proffered facts are not identical to the proffered facts involving Varney.

Although Halfhill did not raise the issue of Raymond as an other suspect at trial, an exception to the rule precluding review of an unpreserved claim of error is a "manifest error affecting a constitutional right."  State v. Grott, 195 Wn.2d 256, 267, 458 P.3d 750 (2020) (quoting RAP 2.5(a)(3)); State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).  "A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal."  State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing State v. Nichols, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007)).

We review ineffective assistance of counsel claims de novo.  State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).  A defendant is guaranteed the right to the effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984); U.S. CONST. amend. VI.  Counsel is ineffective where both counsel's performance was deficient, and counsel's deficiency prejudiced the defendant.  Strickland, 466 U.S. at 687.  If

7

Halfhill cannot establish either deficiency or prejudice, our analysis ends. State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018). There is a strong presumption of effective representation. McFarland, 127 Wn.2d at 334-35. Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel. Id. at 336. Moreover, trial counsel's performance will be evaluated in the context of the whole record. State v. Ciskie, 110 Wn.2d 263, 284, 751 P.2d 1165 (1988). To establish prejudice, Halfhill must show that the result of the proceeding would have been different but for counsel's deficient representation. McFarland, 127 Wn.2d at 333.

Our first inquiry is whether Halfhill's defense counsel was deficient. Halfhill fails to show the absence of legitimate strategic or tactical reasons why defense counsel would attempt to introduce Varney as an other suspect and not Raymond. Instead, Halfhill contends that Raymond was the better other suspect candidate than Varney because there was a reasonable probability that evidence pertaining to Raymond would have been admissible at trial.

The Sixth Amendment requires an accused be given a meaningful opportunity to present a complete defense. State v. Cayetano-Jaimes, 190 Wn. App. 286, 295-98, 359 P.3d 919 (2015); Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 3, § 22. Defense evidence need only be relevant to be admissible. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). "The threshold analysis for 'other suspect' evidence involves a straightforward, but

focused, relevance inquiry, reviewing the evidence's materiality and probative value for 'whether the evidence has a logical connection to the crime.'" State v. Giles, 196 Wn. App. 745, 756, 385 P.3d 204 (2016) (citing State v. Franklin, 180 Wn.2d 371, 381-82, P.3d 204 (2016)). The focus is on whether the proffered evidence tends to create a reasonable doubt as to the defendant's guilt. Franklin, 180 Wn.2d at 381.

"[S]ome combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." Id. There is no per se rule against admitting circumstantial evidence of another person's motive, ability, or opportunity to commit a crime. Id. at 373. "[I]f there is an adequate nexus between the alleged other suspect and the crime, such evidence should be admitted." Id.

Between Varney and Raymond, Varney was a stronger, albeit insufficient, candidate to proffer as an other suspect. Halfhill's proffered evidence related to Varney's attempt to sell Meyer morphine pills and getting angry when a deal did not go through.

> In his offer of proof, Halfhill stated that Holloway would testify that Meyer called him to ask if he could trust Varney, and that Varney met up with Meyer sometime between June 9 and June 17. Holloway was aware that Varney had violent tendencies, and told defense counsel that out on a paint job one day, Varney said, "'[Y]ou will never see him again,'" referencing Meyer. Holloway also told defense counsel that Varney told him Meyer would be easy to mug. Varney made these statements before Holloway learned Meyer was missing. After learning of Meyer's death, Varney told Holloway he had a sword. When Holloway asked Varney how you cut someone up with a sword, Varney told him that "you use saws to cut people up."

Halfhill, No. 77246-5-I, slip op. at 14.

The proffered evidence for Raymond is even weaker. Raymond only lived with Meyer for a week and a half in early June. In Raymond's interview, he guessed that Meyer had been beaten with a baseball bat because he heard from someone else that Meyer got his head "beat off." Raymond also had told police that he remembered seeing a baseball bat that Meyer kept by his door in his apartment. There is only speculative evidence that Raymond had motive (the $750 rent he allegedly owed Meyer), and there was no showing of opportunity (no evidence of Raymond being near Meyer at the time of his disappearance). Halfhill also now presents allegations in his self-serving declaration that he would have known at the time of his trial and that are unsupported by the record.[2] There is no logical connection between Raymond and the murder.

Because Halfhill fails to establish counsel was deficient for not attempting to offer evidence of Raymond as an other suspect, our inquiry ends. Classen, 4 Wn. App. 2d at 535.

### DNA Testing

Halfhill further contends that we should order DNA testing because "it would probably show Halfhill's innocence." Halfhill notes that the garbage bags containing Meyer's torso and body parts and the associated recycling cart were submitted to evidence for latent fingerprint examination, but not for DNA examination. He seeks relief in the form of a reference hearing under RAP

---

[2] Halfhill claims Raymond stabbed Halfhill on two separate occasions, that Raymond had Halfhill's keys to his car and storage unit while Halfhill was in Florida, that Raymond lost the keys to Halfhill's van, and that Raymond stored some of his tools in Halfhill's storage unit.

16.12,[3] which he contends would be carried out in a manner that complies with the statutory procedure under RCW 10.73.170.

To obtain a reference hearing, Halfhill "must raise disputed material facts that, if proved, would establish prejudice sufficient to entitle him to relief." Matter of Lui, 188 Wn.2d 525, 541-42, 397 P.3d 90 (2017). "Bald assertions and conclusory allegations will not support the holding of a hearing." In re Rice, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). When cases are transferred to the superior court for a reference hearing, the superior court enters findings of fact and has the findings and files forwarded to the appellate court for review.[4]

RCW 10.73.170 authorizes post-conviction DNA testing if the results could provide significant new information that would likely exonerate the petitioner.

---

[3] RAP 16.12 provides the following:
> If the appellate court transfers the petition to a superior court, the transfer will be to the superior court for the county in which the decision was made resulting in the restraint of petitioner or, if petitioner is not being restrained on the basis of a decision, in the superior court in the county in which petitioner is located. If the respondent is represented by the Attorney General, the prosecuting attorney, or a municipal attorney, respondent must take steps to obtain a prompt evidentiary hearing and must serve notice of the date set for hearing on all other parties. The parties, on motion, will be granted reasonable pretrial discovery. Each party has the right to subpoena witnesses. The hearing shall be held before a judge who was not involved in the challenged proceeding. The petitioner has the right to be present at the hearing, the right to cross-examine adverse witnesses, and the right to counsel to the extent authorized by statute. The Rules of Evidence apply at the hearing. Upon the conclusion of the hearing, if the case has been transferred for a reference hearing, the superior court shall enter findings of fact and have the findings and all appellate court files forwarded to the appellate court. Upon the conclusion of the hearing if the case has been transferred for a determination on the merits, the superior court shall enter findings of fact and conclusions of law and an order deciding the petition.

[4] Under RAP 16.13, after a reference hearing, the Chief Judge may dismiss the petition on the ground that it is frivolous or refer the petition to a panel of judges for determination on the merits.

State v. Riofta, 166 Wn.2d 358, 363-64, 209 P.3d 467 (2009). The purpose of this statute is to provide a means for the convicted person to obtain evidence in support of a motion for post-conviction relief on the grounds of newly discovered evidence. Id. at 368.

Halfhill meets the first procedural requirement under RCW 10.73.170(1) that he was convicted of a felony. However, he did not file his request as a motion with "the court that entered the judgment of conviction," as directed under RCW 10.73.170(1).[5] He also fails to comply with the procedural requirement under RCW 10.73.170(2)(b).

RCW 10.73.170(2), (3) provides the following:

(2) The motion shall:
(a) State that:
(i) The court ruled that DNA testing did not meet acceptable scientific standards; or
(ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
(iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
(b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
(c) Comply with all other procedural requirements established by court rule.
(3) The court shall grant a motion requesting DNA testing under this section if such motion is in the form required by subsection (2) of this section, and the convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis.

---

[5] RCW 10.73.170(1) provides: A person convicted of a felony in a Washington state court who currently is serving a term of imprisonment may submit to the court that entered the judgment of conviction a verified written motion requesting DNA testing, with a copy of the motion provided to the state office of public defense.

A reference hearing is not the appropriate relief here.[6]  There are no material facts to be found by the trial court.  Even if we were to consider ordering post-conviction DNA testing, Halfhill does not explain why the DNA evidence is material to the identity of the perpetrator or show the likelihood that the DNA evidence would demonstrate his innocence on a more probable than not basis.  The torso and recycling bin were traced to a house demolition site about a month after Meyer disappeared.  The other remains were found five months later in an area where the homeless congregate.  Halfhill does not explain how finding Raymond's DNA on items left out in the open exonerate Halfhill or establish that Raymond had the opportunity and the means to commit the crime.

Halfhill also argues that DNA extracted from under Meyer's fingernails should be tested against Raymond's DNA.  However, O'Neill could only obtain trace DNA with limited genetic information from the fingernail samples, which were consumed with testing and that no comparisons were possible.  O'Neill's trial testimony comports with her laboratory report, which was issued almost five years before the trial.  It also is consistent with her defense interview.  Id.  It is not possible to conduct post-conviction testing of the DNA recovered from underneath Meyer's fingernails, and thus Halfhill has not shown the likelihood that the DNA evidence would demonstrate his innocence on a more probable

---

[6] We note that in In re Bradford, 140 Wn. App. 124, 127, 165 P.3d 31 (2007), Division Three's Chief Judge ordered a reference hearing in response to a PRP, directing the superior court "to resolve the factual dispute of whether DNA evidence so reduces the possibility that Mr. Bradford is the perpetrator that, when considered with the other evidence admitted at Mr. Bradford's trial, it will probably change the result of that trial."  The court did not explain why it did so.

13

than not basis.

Halfhill does not raise disputed material facts that, if proved, would established prejudice sufficient to entitle him to relief. A reference hearing is not warranted.

<u>Sufficiency of the Evidence</u>

Halfhill also argues that the evidence is insufficient to sustain the conviction of murder in the second degree. Halfhill concedes that we already addressed this argument on direct appeal. However, Halfhill asks us to exercise our discretion to consider the merits of the issue again in the interests of justice. <u>Id.</u>

A personal restraint petition is not meant to serve as a forum for relitigating issues that were already considered on direct appeal. <u>In re Pers. Restraint of Lord</u>, 123 Wn.2d 296, 329, 868 P.2d 835 (1994); <u>In re Pers. Restraint of Pirtle</u>, 136 Wn.2d 467, 491, 965 P.2d 593 (1998). A petitioner is prohibited from renewing an issue that was raised and rejected on direct appeal unless the interests of justice require relitigating that issue. <u>Yates</u>, 177 Wn.2d at 17. A petitioner can show that reconsideration serves the interests of justice only if there has been "an intervening change in the law 'or some other justification for having failed to raise a crucial point or argument in the prior application.'" <u>Id.</u> (quoting <u>In re Pers. Restraint of Stenson</u>, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)).

Simply revising a previously rejected legal argument neither creates a new claim nor constitutes good cause to reconsider the original claim. <u>In re Pers.</u>

Restraint of Jeffries, 114 Wn.2d 485, 488, 789 P.2d 731 (1990). "[A] collateral attack by PRP on a criminal conviction and sentence should not simply be reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant." In re Pers. Restraint of Gentry, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999). Nor may a petitioner create a different ground for relief merely by alleging different facts, asserting different legal theories, or couching the argument in different language. Lord, 123 Wn.2d at 329.

In his direct appeal, we held that the evidence was sufficient to sustain the conviction of murder in the second degree. Halfhill, No. 77246-5-I slip op. at 9. Halfhill provides no basis to justify another review as to this issue.

### Client File

Halfhill finally contends that he is entitled to his client file and the discovery generated in this case. However, this claim is not properly before us to review as there was no prior determination by the lower court. RAP 2.5(a). Halfhill relies on State v. Padgett, 4 Wn. App. 2d 851, 424 P.3d 1235 (2018) to support his position, but in Padgett the petitioner filed his motion to compel production of his client file with the trial court, not the appellate court. We decline to address this

on appeal.

We deny Halfill's request for a reference hearing and dismiss his PRP.

_Coburn, J._

WE CONCUR:

_Bürk, J._          _Dwyer, J._