IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39118-3-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 39280-5-III) |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER B. RAMIREZ, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — Christopher Ramirez, previously convicted of two counts of first degree murder and unlawful possession of a firearm, appeals the trial court's denial of his postconviction motions for DNA testing and for leave to examine evidence. We affirm.

FACTS

On November 1, 2014, brothers Arturo and Juan Gallegos were fatally shot at the Broadway Square Apartments in Spokane Valley, where they resided together. Data obtained from cellular towers placed Christopher Ramirez, nephew of Arturo and Juan,[1]

---

[1] To avoid confusion, we refer to the Gallegos brothers by first name.

in the vicinity of the apartments at the time of the murders. Mr. Ramirez used the alias

"Demon." Rep. of Proc. (RP) at 463. Within minutes of the shootings, an individual

identifying himself as "Demon" appeared in the backyard of Carlton Hritsco, two blocks

south of the Broadway Square Apartments. RP at 514. The individual behaved

nervously, ducking behind Mr. Hritsco's vehicle when traffic passed in the street. Before

leaving the property, the individual inquired about nearby bus service, then placed a call

on his cell phone. Cellular data later indicated Mr. Ramirez, at approximately this time,

used his own cell phone to call Spokane Transit Authority's (STA's) bus information line.

This call was placed from the vicinity of Mr. Hritsco's home.

Two hours later, a law enforcement K-9 tracked a human scent from the Broadway

Square Apartments to Mr. Hritsco's home. After learning of the above encounter,

investigators showed Mr. Hritsco a photo array of the five individuals known locally to

use the alias "Demon," one of whom was Mr. Ramirez. RP at 477-78. Mr. Hritsco was

unable to identify Mr. Ramirez as the individual who had appeared in his yard, as the

hairstyles of the photographed men were dissimilar to the man he had seen. However,

Mr. Hritsco eventually identified Mr. Ramirez after seeing an updated photograph of him

on TV news. In his first interview with law enforcement, Mr. Hritsco had estimated the

man who entered his yard to be five feet, eight inches tall. Although Mr. Ramirez's photo

identification listed him as six feet tall, a subsequent booking photograph showed him to be approximately five feet, nine inches tall.

Besides Mr. Hritsco, investigators in the hours following the murders also contacted Angel Valerio, a son-in-law of Arturo's. Upon hearing of the murders, Mr. Valerio immediately expressed his suspicion that Mr. Ramirez was involved. According to Mr. Valerio, Mr. Ramirez and his uncle Arturo had had an acrimonious relationship. Several months before the murders, on a family text chain, Mr. Ramirez had threatened Arturo specifically and the family in general, stating: "'Tio. We all die. Rest in peace. Fuck you all if that's how it is.'" RP at 376. On another occasion, Mr. Ramirez had pulled a knife on Arturo.

The State charged Mr. Ramirez with two counts of murder in the first degree and one count of unlawful possession of a firearm. At trial, law enforcement officers, an FBI cellular data expert, Mr. Hritsco, and Mr. Valerio all testified to the facts above. Additionally, the State offered testimony from a DNA analyst who had examined two items discovered near Arturo's body: a knit hat and a glove. Swabs from within both items showed Mr. Ramirez was a major contributor of genetic material, with Arturo and Juan ruled out as contributors. Swabs of bloodstains on the exterior of the hat showed the blood belonged to Arturo. The interior swabs also revealed an unidentified minor

contributor, whom the DNA analyst labeled "Individual A."  RP at 813.  When compared against the Washington State DNA database, Individual A yielded no matches. Individual A's DNA was not compared against the national database.  Individual A was not then and still has not been identified.

Mr. Ramirez called just one witness at trial, another resident of Broadway Square Apartments who was an acquaintance of Maceo Williams—another of the five individuals known locally to use the alias "Demon."  RP at 1094.  The witness, Nick Foss, did not place Mr. Williams at or near Broadway Square Apartments on the night of the murders.  He merely testified that he was acquainted with Mr. Williams.

Concerning the State's evidence, Mr. Ramirez challenged the reliability of Mr. Hritsco's identification of him, influenced as it was by media coverage of the case.  Mr. Ramirez also argued that under the time frame Mr. Hritsco gave for his encounter with Demon, the person he was speaking with would have arrived in his yard well before the first 911 calls reporting the murders and possibly before the murders themselves.  Finally, Mr. Ramirez argued law enforcement mismanaged the investigation when they neglected to DNA-swab a vomit trail they discovered at the crime scene.  While it is true law enforcement did not swab the vomit for DNA, the State's DNA expert testified that vomit is a poor source of DNA, as the stomach acid in vomit degrades any testable sample.

The jury convicted Mr. Ramirez on all three counts, and the trial court sentenced him to 988 months' imprisonment. Mr. Ramirez filed an unsuccessful appeal and unsuccessful personal restraint petition. *In re Pers. Restraint of Ramirez*, No. 37774-1-III (Wash. Ct. App. Jul. 12, 2022) (unpublished) http://www.courts.wa.gov/opinions/ pdf/377741_unp.pdf.

Later, he sought postconviction relief from the trial court in the form of (1) further DNA testing of the samples collected from the hat and the glove found at the crime scene, and (2) leave to conduct forensic analysis of hairs discovered in the hat. In support of his request for relief, Mr. Ramirez offered a declaration from Chesterene Cwiklik, a forensic scientist qualified to perform the analysis. Ms. Cwiklik stated that such analysis could determine which hair samples were deposited from wear and which were deposited as debris. The analysis could also compare hair samples for consistency. However, only DNA testing could definitively identify which individuals contributed which hairs.

The trial court issued memorandum opinions denying Mr. Ramirez's motions. It concluded further DNA testing was unwarranted because even a favorable result from an additional test would not mitigate the body of evidence supporting Mr. Ramirez's conviction. It concluded forensic analysis of the hairs in the hat was unwarranted because (1) such analysis could produce no evidence that was not cumulative to the DNA

evidence already produced, and (2) Mr. Ramirez failed to identify the relief to which he would be entitled after analysis of the hairs.

Moreover, the court noted Mr. Ramirez had not explained how a personal restraint petition would even be viable at this stage, as he had exceeded the one-year limitation on collateral attacks under RCW 10.73.090. While RCW 10.73.100 provides exceptions to the one-year ban, Mr. Ramirez had not explained how an exception would apply to his case.

Mr. Ramirez appeals the trial court's denial of these two requests for postconviction relief.

ANALYSIS

POSTCONVICTION DNA TESTING

Mr. Ramirez argues the trial court erred in denying further DNA testing because identification of the unknown DNA contributor at the crime scene would tie another felon to the scene and indicate Mr. Ramirez was probably innocent. We disagree.

*Standard of review*

We review a trial court's denial of postconviction relief for abuse of discretion. *State v. Riofta*, 166 Wn.2d 358, 370, 209 P.3d 467 (2009). A trial court abuses its discretion when it exercises authority "'on untenable grounds or [for] untenable

reasons.'" *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)).

*Petition for additional testing*

RCW 10.73.170 allows a convicted defendant to secure additional DNA testing of evidence from trial if three procedural[2] and one substantive[3] criteria are met. The State limits its argument to the substantive criterion, which requires the defendant to show that additional DNA evidence would likely demonstrate his innocence "on a more probable than not basis." RCW 10.73.170(3).

When considering a petition for additional testing, the court must extend to the defendant a presumption that further testing will yield an exculpatory result. *Riofta*, 166 Wn.2d at 369. However, the RCW 10.73.170(3) substantive requirement is "onerous." *Id.* at 367; *see also State v. Crumpton*, 181 Wn.2d 252, 261, 332 P.3d 448 (2014). A defendant will not secure additional testing unless the presumed exculpatory result would so offset the remaining evidence against him that his innocence becomes not merely a possibility, but a probability. *See Riofta*, 166 Wn.2d at 369 ("[C]ourts must consider . . . the impact that an exculpatory DNA test could have in light of [the remaining]

---

[2] *See* RCW 10.73.170(1), (2)(a), (2)(b).

[3] *See* RCW 10.73.170(3).

evidence."); *see also Crumpton*, 181 Wn.2d at 260 (Courts must "look to whether, considering all the evidence from trial and assuming an exculpatory DNA test result, it is likely the individual is innocent on a more probable than not basis.").

### *i. Exculpatory result limitations*

RCW 10.73.170 does not define what exculpatory result courts must presume when ruling on a motion for additional DNA testing. However, the cases interpreting this statute make clear the defendant is entitled only to a presumption that the test result itself will be exculpatory and not a presumption that the test result will trigger a chain of discoveries all favorable to the defendant. *See State v. Braa*, 2 Wn. App. 2d 510, 521, 410 P.3d 1176 (2018) ("[N]either our Supreme Court nor this [appellate] court has held that a petitioner is entitled to additional inferences in his favor beyond the assumption of a favorable DNA test result."). In *Riofta*, for example, a defendant convicted of assault with a firearm enjoyed only the presumption that further DNA testing of a hat worn by the shooter would show either the absence of the defendant's DNA or the presence of a third person's DNA. 166 Wn.2d at 370. The court did not presume any further exculpatory "result" in the form of collected DNA implicating any third person in the crime. *See id.* at 370-71.

Here, Mr. Ramirez argues the court when considering his petition must presume not only that further testing will identify a third person's DNA, but that the DNA will match in the national CODIS[4] database, thereby implicating someone else in the murders. However, what Mr. Ramirez characterizes as a single presumption in his favor in fact is three presumptions daisy-chained together: (1) identification of a third person's DNA, (2) a CODIS match, and (3) a plausible link to Broadway Square Apartments on the night of the murders. To impose such presumptions on the trial court would be to impose additional favorable inferences to which defendants are not entitled. *Braa*, 2 Wn. App. 2d at 521. Accordingly, we impose only the first presumption—namely, that further testing of Individual A's DNA will show Individual A is a third person and not Mr. Ramirez. This is the full extent of the exculpatory presumption to which defendants are entitled under *Riofta* and its line of cases. 166 Wn.2d at 370; *see also State v. Gray*, 151 Wn. App. 762, 774, 215 P.3d 961 (2009); *State v. Thompson*, 155 Wn. App. 294, 304, 229 P.3d 901 (2010), *aff'd*, 173 Wn.2d 865, 271 P.3d 204 (2012).

Mr. Ramirez opposes this view, arguing the presumed exculpatory result cannot be information already in the record without further testing. Instead, the result must exculpate the defendant in some new way. In his view, because the State's DNA expert

---

[4] Combined DNA Index System.

9

testified at trial that Mr. Ramirez was not the source of Individual A's DNA, the court now must presume a further DNA test would yield an exculpatory result in excess of that conclusion.

We disagree. That a jury when it convicted Mr. Ramirez was already in possession of an exculpatory DNA test does not broaden the presumption to which he is entitled when seeking postconviction relief. On the contrary, it suggests an exculpatory DNA test, in light of other evidence, was not sufficient to persuade the jury even of reasonable doubt, let alone probability of innocence. In this way, the exculpatory result introduced at trial weighs against Mr. Ramirez's petition for additional testing, rather than lightening his burden when seeking it.

We hold that a defendant seeking additional DNA testing under RCW 10.73.170 is entitled only to the presumption that the test itself will yield an exculpatory result and not that the test will trigger a sequence of downstream exculpatory discoveries. This holding does not conflict with *Braa*, where the court determined the defendant was entitled to the presumption that the tested DNA would belong to the victim, rather than simply *not* belonging to the defendant. Even in that case, the presumed result remained one discrete, binary result—the DNA would belong to the victim or it would not, just as, in a more typical case, the DNA would belong to the defendant or it would not. Whatever the

10

details of a presumed test result, we hold the presumption extends only to the result itself

and not to any series of speculative eventualities, each depending on those preceding it.

### ii. Probability of innocence

A petitioner under RCW 10.73.170(3) will secure postconviction DNA testing

only if an exculpatory result would, on a more-probable-than-not basis, "demonstrate

[his] innocence in spite of the multitude of other evidence against [him]." *Crumpton*,

181 Wn.2d at 262. For the reasons discussed below, the considerable evidence of Mr.

Ramirez's guilt would withstand the impact of an exculpatory test result.

First, the jury already possessed exculpatory DNA evidence when it convicted Mr.

Ramirez of the murders. The State's DNA expert testified that he swabbed two genetic

profiles from the hat and glove discovered near Arturo's body. The major contributor

was Christopher Ramirez. The minor contributor was an unidentified "Individual A" who

was neither Mr. Ramirez nor either of the victims.

RP at 813. Were this court to order additional DNA testing, the results, under the

presumption described above, would merely duplicate these facts. The additional testing

would register no impact at all on the evidence presented at trial because the results of

that testing were themselves presented at trial.

Even if, arguendo, we broadened the exculpatory presumption to encompass not only a favorable test result but indeed a match with that result in the national CODIS database, Mr. Ramirez still could not demonstrate his innocence on a more-probable-than-not basis. After all, the State's DNA expert already established that Individual A did not match against any felons in Washington's own CODIS database. Accordingly, any match new testing identified would be with an out-of-state felon whose connection to the crime scene was, one might assume, more tenuous than Mr. Ramirez's own connection. Mr. Ramirez could argue that individual *was* connected to the crime scene, as his DNA was found in the hat, but then again Mr. Ramirez's own DNA was found in that same hat, and as a major contributor. Mr. Ramirez's argument also assumes the felon identified as Individual A would prove not to have been incarcerated at the time of the murders, or deceased, or otherwise vindicated by an alibi. By contrast, existing evidence shows Mr. Ramirez was not incarcerated at the time of the murders, nor was he deceased, nor did he offer an alibi.

At the time of the murders, Mr. Ramirez was carrying a phone that was pinging cellular towers in the vicinity of the Broadway Square Apartments. Someone matching Mr. Ramirez's description was showing up in a backyard two blocks from the Broadway Square Apartments, introducing himself as "Demon," Mr. Ramirez's own alias. RP at

463. That individual behaved suspiciously, ducking behind cars when traffic passed in the street. That individual inquired as to bus routes and made a call on his phone at approximately the same time Mr. Ramirez himself, using his own phone, called the STA bus information hotline. Finally, Mr. Ramirez several months before the murders had threatened to kill one of the victims. On another occasion, he had pulled a knife on that victim. When the son-in-law of that victim heard about the murders, the first word out of his mouth was "Chris." RP at 369-70.

In sum, DNA evidence played only an ancillary role in convicting Mr. Ramirez. Any further DNA testing would, for that reason, lack sufficient import to offset the "multitude of other evidence against [him]." *Crumpton*, 181 Wn.2d at 262. This is true even if this court were to extend to Mr. Ramirez an overbroad exculpatory presumption to which petitioners under RCW 10.73.170(3) are not entitled.

Finding no abuse of discretion, we affirm the trial court's denial of further DNA testing.

### POSTCONVICTION HAIR ANALYSIS

Mr. Ramirez argues the trial court should have permitted postconviction discovery of hair found at the crime scene because such discovery would entitle him to relief in the form of (1) a meritorious personal restraint petition and (2) access to postconviction DNA

13

testing.  Furthermore, Mr. Ramirez argues the court should have awarded such discovery because the burden it would impose on the State is slight compared to the procedural protection it would afford him.  We disagree.

*Standard of review*

Washington courts have not announced a uniform standard of review for a trial court's denial of postconviction discovery.  *See State v. Asaeli*, 17 Wn. App. 2d 697, 699, 700, 491 P.3d 245, *review denied*, 198 Wn.2d 1026, 498 P.3d 955 (2021).  However, the emerging practice across jurisdictions is to apply abuse-of-discretion review.  *See, e.g.*, *State v. Butler*, 315 Kan. 18, 20-21, 503 P.3d 239 (2022); *see also State v. O'Brien*, 214 Wis. 2d 328, 344, 572 N.W.2d 870 (Ct. App. 1997), *aff'd*, 223 Wis. 2d 303, 588 N.W.2d 8 (1999); *Commonwealth v. Bridges*, 584 Pa. Super. 589, 595, 886 A.2d 1127 (2005); *Reed v. State*, 116 So. 3d 260, 267 (Fla. 2013); *Elliott v. State*, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992).  Abuse of discretion is the standard of review Washington courts apply to other postconviction relief matters (such as postconviction DNA testing, as discussed above).  *See State v. Smith*, 159 Wn. App. 694, 699, 247 P.3d 775 (2011); *Riofta*, 166 Wn.2d at 370.  Additionally, it is the standard of review Washington courts apply to *pretrial* discovery motions.  *Asaeli*, 17 Wn. App. 2d at 699.  For these reasons, we apply abuse of discretion to this issue as well.

*Good cause*

There is no constitutional right to postconviction discovery. *See In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 391, 972 P.2d 1250 (1999) (quoting *Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993)). Petitioners seeking postconviction discovery will prevail "only to the extent [they] can show good cause to believe the discovery would prove entitlement to relief." *Id.*

Here, Mr. Ramirez contends postconviction forensic analysis of hairs found at the crime scene would entitle him to relief in the form of (1) a meritorious personal restraint petition and (2) access to postconviction DNA testing. Under Mr. Ramirez's theory, forensic analysis of hairs found at the crime scene would undergird a successful personal restraint petition because that analysis would show ineffective assistance of counsel. Specifically, Mr. Ramirez argues the forensic analysis would identify a plausible second suspect in the Gallegos murders, which would show his counsel had been deficient by not requesting such analysis before trial. In support of this view, Mr. Ramirez cites *Strickland v. Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires defense counsel to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Mr. Ramirez also cites *Richter v. Hickman*, 578 F.3d 944, 953 (9th Cir. 2009), *rev'd and remanded on other*

15

*grounds sub nom. Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624

(2011), which held that representation is deficient when counsel fails to pursue forensic

testing that is "critical to the success of [the] defense."

However, Mr. Ramirez's counsel was not deficient for failure to pursue forensic

analysis of the hair because such analysis could produce no material evidence that was not

already produced at trial. Mr. Ramirez's expert on this issue, Chesterene Cwiklik, stated

in her declaration that forensic analysis of the hair, on its own, could determine which

hairs had been deposited in the hat by wear, versus which were deposited as debris. The

analysis could also compare hair samples to determine consistency between them.

However, such analysis could not determine the source of a given strand of hair. Such a

determination, Ms. Cwiklik conceded, would require DNA testing. In sum, the forensic

analysis Mr. Ramirez seeks is of cruder evidentiary value than the sophisticated DNA

analysis the State already performed on the hat and presented to the jury.

Moreover, as the trial court recognized, Mr. Ramirez fails to explain

how a personal restraint petition would even be viable at this stage, as he has

exceeded the one-year limitation on collateral attacks under RCW 10.73.090.

While RCW 10.73.100 provides exceptions to the one-year ban, Mr. Ramirez does

not explain how any of the exceptions would apply here.

16

No. 39118-3-III; No. 39280-5-III
*State v. Ramirez*

For the above reasons, we conclude the trial court did not abuse its discretion in denying Mr. Ramirez's request for postconviction discovery.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____          _____
Pennell, J.                                                      Staab, J.